ERK:MAA:SBK:TM
F.#2006R00073

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    -against-

BRADLEY STINN,

         Defendant.

- - - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. _____
(T. 15, U.S.C., §§ 78m(a)
and 78ff; T. 18, U.S.C.,
§§ 1341, 1348, 1349,
1350(c)(2), 2,
981(a)(1)(C) and 3551
et seq.; T. 21, U.S.C.,
§ 853; T. 28, U.S.C.,
§ 2461(c))

THE GRAND JURY CHARGES:

INTRODUCTION

      At all times relevant to this Indictment, unless otherwise indicated:

I.   Background

    A.   The Company

        1.   Friedman's Inc. ("Friedman's" or the "Company"), was a Delaware corporation with its headquarters and principal place of business located in Savannah, Georgia.  Friedman's was the third-largest specialty retailer of fine jewelry in the United States.  As of September 2003, Friedman's operated approximately 686 stores in 20 states.  Friedman's reported over $400 million in net sales in each of its fiscal years ending September 2001 and 2002.

        2.   Friedman's was a publicly traded corporation, the Class A common stock of which was listed on the New York Stock

Exchange from June 2003 through May 2004 under the ticker symbol "FRM".  Prior to June 2003, Friedman's Class A common stock was traded on the NASDAQ.  The holders of Friedman's Class A common stock were located throughout the United States, including in the Eastern District of New York.

3.    As a public company, Friedman's was required to comply with the rules and regulations of the United States Securities and Exchange Commission (the "SEC").  The SEC's rules and regulations were designed to protect members of the investing public by, among other things, ensuring that a company's financial information was accurately recorded and disclosed to the investing public.

4.    Under the SEC's rules and regulations, Friedman's and its officers were required to (a) make and keep books, records and accounts that, in reasonable detail, fairly and accurately reflected the Company's business transactions, including its earnings, revenue and expenses; (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that the Company's transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP"); and (c) file with the SEC quarterly reports (on Form 10-Q) and annual reports (on Form 10-K) that included financial statements that accurately presented Friedman's financial condition and the

results of its business operations in accordance with GAAP.
Friedman's and its officers were also required to have these
annual reports reviewed by an independent, outside auditor.

    B.    <u>The Defendant</u>

        5.    The defendant BRADLEY STINN was employed by
Friedman's as Chief Executive Officer from September 1992 through
December 1997 and from September 1998 until he resigned in
December 2003.   STINN served as the Chairman of the Executive
Committee of Friedman's Board of Directors from July 1998 through
December 2003.   From in or about June 1995 to December 2003, STINN
also served as the Chief Executive Officer of Crescent Jewelers
("Crescent"), an affiliate of Friedman's.   In addition, from in or
about August 1990 to August 1992, STINN served as the Chief
Financial Officer of Crescent.

        6.    As detailed below, STINN and his co-conspirators
engaged in a scheme to defraud investors by, among other things,
falsifying Friedman's accounting data and misrepresenting
Friedman's financial condition in public statements and reports.
In furtherance of the scheme, documents related to Friedman's SEC
filings, including a September 2003 Prospectus Supplement relating
to an offering of Friedman's Class A common stock, were sent by
mail using an interstate carrier.

4

C.    Friedman's Installment Credit Program

        7.    Friedman's business targeted low to middle income
consumers ages 18 to 45 and offered a selection of fine jewelry to
that market.  Friedman's offered an installment credit program,
which generally required the Company's customers to pay for
jewelry purchased on credit in monthly installment payments.  The
Company described its installment credit program as an "integral
part" of its business strategy, to help its customers finance
their purchases.  In Friedman's fiscal year ending September 28,
2002, the last year for which Friedman's filed an annual report,
the majority of the Company's sales were made on credit.

        8.    Given that such a large portion of Friedman's
business involved credit sales, professional stock analysts and
investors needed to assess the likelihood that Friedman's would be
able to collect on these credit sales in order to evaluate whether
to buy, hold or sell Friedman's stock.  Accordingly, Friedman's
public filings made specific disclosures about the operation of
its installment credit program.  Friedman's also identified the
uncertainty of its credit business as a risk factor to individuals
deciding whether to invest in the Company.

        9.    Friedman's public filings also made representations
about the Company's policy with respect to charging off credit
accounts that appeared to be uncollectible.  To "charge off," or
"write off," an account meant to remove that credit account from

the Company's books by reducing the balance of that account to
zero, even though that balance had not been collected.  According
to its public filings, Friedman's charged off any credit account
where no payment had been received for 120 days, or where
Friedman's determined that the account was otherwise
uncollectible.

      D.   <u>Friedman's Accounts Receivable</u>

      10.  Under GAAP, Friedman's was required to record on
its books the total amount of money owed to the Company by
customers who bought jewelry and other items on credit.  This
amount was recorded as an asset known as "accounts receivable."
Under GAAP, when a credit account at Friedman's was charged off,
the Company was required to reduce accounts receivable in an
amount equal to the charge-off amount.  Friedman's quarterly and
annual reports disclosed the Company's total accounts receivable
as of the end of the period covered by that report.

      (1) <u>Currency and Delinquency Percentages</u>

      11.  Because Friedman's ability to collect on its
outstanding credit accounts was important to professional stock
analysts and investors, Friedman's provided information to the
market about the extent of delinquency of the Company's accounts
receivable.

      12.  This information included data regarding the amount
of time that these accounts were past due, which Friedman's

referred to as the "currency" percentage and the "delinquency"
percentage.  Friedman's defined the "currency" percentage as the
portion of Friedman's accounts receivable that was owed by
customers whose accounts were less than 30 days past due.  Because
these customers were up to date on their payments, Friedman's was
most likely to collect the money owed to the Company by these
customers.  Friedman's defined the "delinquency" percentage as the
portion of Friedman's accounts receivable that was owed by
customers whose accounts were greater than 90 days past due.
Because all of these customers had missed several payments,
Friedman's was least likely to collect the money owed to the
Company by customers in this category.

        13.  Professional stock analysts and investors used the
currency and delinquency percentages disclosed by Friedman's at
the end of each reporting period to evaluate the future
collectibility of Friedman's accounts receivable and to value
Friedman's common stock.

        (2)  The Allowance for Doubtful Accounts

        14.  Under GAAP, Friedman's was required to estimate the
amount of the Company's accounts receivable that it expected to be
uncollectible.  The Company was required to record this amount on
its books in what was known as a "reserve."  The name of this
reserve was the "allowance for doubtful accounts."

15.  Each quarter, Friedman's reported its allowance for doubtful accounts as a percentage of its total accounts receivable.  Under GAAP, Friedman's was required to subtract from earnings amounts added to its allowance for doubtful accounts reserve, so that the Company's earnings only included credit sales that the Company truly expected to collect.

16.  The allowance for doubtful accounts percentage was important information for investors.  Among other things, it was used by professional stock analysts and investors to assess the future profitability of the Company.

II.  The Securities Fraud Scheme

17.  The defendant BRADLEY STINN, together with others, engaged in a scheme to misrepresent Friedman's true financial condition to the Company's shareholders and the investing public. On behalf of Friedman's, STINN and others filed financial reports and made other public statements that contained material misrepresentations and omitted facts necessary to make these statements truthful and not misleading, regarding, among other things: (a) the operation of the Company's installment credit program; (b) the delinquency and collectibility of the Company's outstanding credit accounts; and (c) the Company's earnings.  The misleading portrayal of Friedman's financial condition artificially inflated Friedman's stock price.

A.   Misrepresentations Regarding the Operation
     of Friedman's Installment Credit Program

18.   In or about and between 2001 and 2003, Friedman's
public filings contained materially false and misleading
statements about the operation of the Company's installment credit
program.   These public filings stated that the Company "adhere[d]
to strict credit application guidelines in determining whether our
customers qualify for credit."   The filings further stated that
the Company used a computer credit scoring process to determine
whether a customer should be approved for credit and, if so, the
amount of credit that should be extended.

19.   As the defendant BRADLEY STINN knew, Friedman's
statements in its public filings about the strict operation of its
credit granting policies and procedures were false and misleading.
Although Friedman's had strict credit granting guidelines in
place, Friedman's employees, with the knowledge and encouragement
of senior management, including STINN, routinely extended credit
to customers in violation of the Company's guidelines.   Friedman's
failure to follow its own credit granting guidelines achieved
STINN's and others' goal of increasing Friedman's reported sales.

20.   STINN concealed Friedman's failure to adhere to its
credit guidelines from the investing public.   STINN continued to
approve Friedman's public filings even though, as he then and
there well knew and believed, they contained false and misleading
statements regarding Friedman's operation of its installment

credit program.  These filings included, among other filings, the
annual 10-K reports for the fiscal years ended September 29, 2001
and September 28, 2002, and February 2002 and September 2003
Prospectus Supplements filed in connection with offerings of
Friedman's stock.

  B. Misrepresentations Concerning the Delinquency and
    Collectibility of Friedman's Accounts Receivable

  21.  Friedman's failure to follow its own credit
granting guidelines resulted in a rising number of uncollectible
credit accounts.  The defendant BRADLEY STINN and other Friedman's
executives were aware of and concealed the increase in
uncollectible credit accounts from investors by manipulating the
data used in the calculation of Friedman's currency percentage,
delinquency percentage and allowance for doubtful accounts
reserve.  The purpose and effect of these manipulations was to
ensure that Friedman's publicly reported financial results did not
reflect the full extent of Friedman's collection problems.

  22.  As a result of these manipulations, in multiple
quarters, Friedman's reported a currency percentage that was
materially higher and a delinquency percentage that was materially
lower than the actual percentages.  These manipulations also
caused Friedman's to materially underreport its allowance for
doubtful accounts.  STINN approved multiple public filings and
other public documents that, as he knew and believed, contained
false financial information about Friedman's allowance for

doubtful accounts, currency and delinquency percentage, including
Friedman's annual reports for the fiscal years ended September 29,
2001 and September 28, 2002, public documents and statements
disclosing Friedman's quarterly results for multiple quarters in
or about and between June 2002 and June 2003, and February 2002
and September 2003 Prospectus Supplements filed in connection with
offerings of Friedman's stock.

23.   These false statements gave shareholders and the
investing public the misimpression that Friedman's was more likely
to collect and less likely to charge off its outstanding credit
accounts than it actually was.   Accordingly, these false
statements misled Friedman's shareholders and the investing public
about the future profitability of the Company.

24.   Examples of these manipulations are set forth in
the following paragraphs.

(1)   The X-Files Manipulation

25.   Prior to filing its report for the quarter ended
June 2002, the defendant BRADLEY STINN and other Friedman's
executives learned that due to a computer error, certain credit
accounts totaling approximately $7.9 million had not aged
properly.   These files became known secretly within the Company as
the "x-files" or the "turd" accounts.   Friedman's computer system
classified all of these x-files accounts as current, that is, as
having no payment due and owing, even though the customers on

approximately 58% of these accounts had not made a payment for 120
days or more, and the customers on approximately 17% of these
accounts had not made a payment for 360 days or more.  Under
Friedman's publicly disclosed credit policies, the Company should
have charged off, or removed from its books, all of the accounts
on which the customer had not made a payment for 120 days or more.
The accounts falling into this category added up to approximately
$4.8 million dollars.

26.  On the orders of STINN and others, and in violation
of Friedman's publicly disclosed policies, Friedman's did not
remove any of the x-files accounts from its books as of the close
of the June 2002 quarter.  Instead, STINN and other Friedman's
executives working at his direction deliberately concealed the
existence and financial impact of the x-files from Friedman's
outside auditor, its shareholders and the investing public.

27.  Furthermore, with STINN'S knowledge and at his
direction, for the quarter ending June 2002, Friedman's materially
overstated its currency percentage by classifying all the x-files
accounts as current.  Likewise, STINN and others caused Friedman's
to materially understate its delinquency percentage by failing to
classify any of the x-files accounts as delinquent.  In addition,
with the knowledge of STINN and others, Friedman's reported a
currency percentage that was materially overstated and a
delinquency percentage that was materially understated in the

Company's annual report for fiscal year 2002 by continuing to mischaracterize the age of the x-files accounts.

28.  Moreover, during conference calls with professional stock analysts, STINN and other Friedman's executives made false statements about the Company's financial results and concealed the existence and impact of the x-files.  For example, on or about July 23, 2002, Friedman's held a quarterly conference call with professional stock analysts to discuss earnings for the Company's third fiscal quarter ending June 29, 2002.  STINN prepared for and participated in the call.  During the call, STINN and other Friedman's executives working at his direction deliberately failed to disclose the existence of the x-files.  Rather than disclosing that the x-files had a material impact on, among other things, the Company's currency and delinquency percentages, a Friedman's executive falsely stated, in substance, that the performance of Friedman's credit portfolio was improving.  In fact, as STINN knew, the performance of Friedman's credit portfolio was getting worse.  Specifically, STINN knew that the information reported during the conference call about the currency percentage, delinquency percentage and the allowance for doubtful accounts reserve was false and did not reflect Friedman's actual financial results.  STINN failed to correct these false and misleading representations.

    (2)   The Manipulation of the Allowance
           for Doubtful Accounts Reserve

29.  In or about and between 2001 and 2003, Friedman's disclosed in its public filings that its allowance for doubtful accounts, that is, the portion of its outstanding accounts receivable that it expected to charge off in the future, was "estimated based on historical experience, the composition of outstanding balances, credit experience trends and other relevant information."  The methodology used to compute Friedman's allowance for doubtful accounts reserve was known as the "migration analysis."

30.  At the defendant BRADLEY STINN's direction, Friedman's reported an allowance for doubtful accounts reserve of 10% of total accounts receivable in its annual reports for fiscal years 2001 and 2002.  As STINN well knew and believed, Friedman's allowance for doubtful accounts reserve percentage should have been much higher than that reported in the 2001 and 2002 annual reports.  To justify the 10% number to its outside auditor, senior Friedman's executives created a fabricated analysis, referred to as the "supplemental migration analysis."  The sole purpose of the supplemental migration analysis was to manipulate Friedman's accounting data in order to achieve the 10% allowance for doubtful accounts percentage mandated by STINN.  As a result, STINN and other senior executives working under his direction caused Friedman's to deliberately underreport its allowance for doubtful

accounts percentage in its annual reports for fiscal years 2001 and 2002.

31.   Friedman's outside auditor questioned the supplemental migration analysis in early 2003.  Based on discussions with representatives of the outside auditor, STINN and other senior Friedman's executives knew that the Company's outside auditor would not approve the Company's 2003 fiscal year end financial statement if Friedman's again reported an allowance for doubtful accounts reserve percentage of only 10%.  In response, instead of accurately estimating the Company's allowance for doubtful accounts reserve, STINN decided that Friedman's would incrementally increase the reserve by 0.5% each fiscal year.  In furtherance of this scheme, STINN caused Friedman's to issue a press release in July 2003 stating that it expected that it would report an allowance for doubtful accounts reserve percentage of 10.5% in its 2003 annual financial statement, even though an internal analysis showed that the reserve should be a much higher percentage of the Company's total accounts receivable.

C.   Manipulation and Lies Regarding Friedman's Earnings

32.   The defendant BRADLEY STINN and others also lied to Friedman's shareholders and the investing public about the Company's earnings.  The term "earnings" referred to a company's net income.  A related term, earnings per share, or "EPS," was an earnings measure reported to shareholders that indicated the

amount of a company's income, on a per-share basis, that a company had available to pay dividends to common stockholders or to reinvest in itself.  Earnings and EPS information were often used by professional stock analysts and investors to evaluate a company's expected future performance.

33.  Regularly, for each fiscal quarter, professional stock analysts predicted the earnings per share, or EPS, of Friedman's stock.  The average of the estimates of the professional stock analysts was commonly referred to as the "consensus estimate."  Friedman's senior executives, including STINN, understood that Friedman's failure to meet or exceed the consensus estimate for a fiscal quarter would likely result in a decrease in the Company's stock price.

34.  In or about and between 2001 and 2003, Friedman's actual financial results did not meet the consensus estimate in multiple quarters.  Instead of disclosing that information to the Company's auditors, its shareholders and the investing public, STINN and other Friedman's executives engaged in a series of accounting manipulations that enabled the Company to report quarterly and annual EPS that were materially better than the Company's actual results.  In some cases, the purpose and effect of these manipulations was to enable the Company's reported EPS to meet or exceed the consensus estimate when, as STINN then and

there well knew and believed, its actual results fell below the consensus estimate.

35.   STINN approved multiple filings and other public statements that he knew contained false EPS numbers, including Friedman's annual reports for the fiscal years ended September 29, 2001 and September 28, 2002, Friedman's quarterly reports for multiple quarters in or about and between June 2002 and June 2003, and February 2002 and September 2003 Prospectus Supplements filed in connection with offerings of Friedman's stock.

36.   STINN and other Friedman's executives used a variety of methods to falsify EPS data.  For example, Friedman's deliberately understated the negative impact of the x-files on earnings in its June 2002 and September 2002 financial reports. In these reports, Friedman's falsely reported an EPS number that either met or exceeded the consensus estimate when, in fact, as STINN knew and believed, Friedman's actual EPS would have been below the consensus estimate in both the June 2002 and September 2002 quarters if the x-files had been accounted for correctly.

37.   Under GAAP, Friedman's also was required to reduce earnings by amounts added to its allowance for doubtful accounts reserve.  Friedman's, at the direction of STINN and others, deliberately understated its allowance for doubtful accounts reserve at 2001 and 2002 fiscal year end, and thus overreported its EPS data for these periods.

III.   The End of the Scheme

        38.   On August 13, 2003, Friedman's was sued in a civil
lawsuit.   On September 8, 2003, the SEC notified Friedman's that
it had opened an informal inquiry into the allegations contained
in the lawsuit.   On September 29, 2003, the United States
Department of Justice notified Friedman's that it was conducting
an investigation relating to the allegations asserted in the
lawsuit.

        39.   On or about October 29, 2003, the Department of
Justice and the SEC advised Friedman's that both entities were
expanding their investigations to include a review of the
Company's allowance for doubtful accounts reserve and other
financial matters.

        40.   On November 11, 2003, Friedman's issued a press
release announcing an increase of its allowance for doubtful
accounts reserve for the 2003 fiscal year end.   This press release
stated that Friedman's expected its allowance for doubtful
accounts reserve to be in the range of 14% to 17% of total
accounts receivable, not the 10.5% reserve that had been disclosed
in the July 2003 press release.   The November 11, 2003 press
release caused a significant drop in the stock price of Friedman's
publicly traded shares.   At the close of business on November 11,
2003, Friedman's Class A common stock was priced at $11.99 per
share.   By the close of trading the next day, November 12, 2003,

the Company's publicly traded stock fell to a price of $7.31 per share, a decrease of approximately 39%.

41.   On November 17, 2003, Friedman's announced that the Company's previously filed financial statements, for at least the fiscal years 2000, 2001, and 2002, and for the first three quarters of fiscal year 2003 would be restated.

42.   On or about December 2, 2003, the defendant BRADLEY STINN resigned from his position as Chief Executive Officer of Friedman's and from the Company's Board of Directors.

<u>COUNT ONE</u>
(Conspiracy to Commit Securities Fraud, Mail Fraud, and Wire Fraud)

43.   The allegations contained in paragraphs 1 through 42 are realleged and incorporated as if fully set forth in this paragraph.

44.   On or about and between July 30, 2002 and December 2003, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant BRADLEY STINN, together with others, did knowingly and intentionally conspire to: (a) execute a scheme or artifice (i) to defraud persons in connection with securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, to wit: the Class A common stock of Friedman's Inc., and (ii) to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and

property in connection with the purchase and sale of securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, to wit: the Class A common stock of Friedman's Inc., in violation of Title 18, United States Code, Section 1348; and (b) devise a scheme and artifice to defraud shareholders and the investing public, and to obtain money and property from shareholders and the investing public by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, and attempting to do so, (i) to cause mail matter to be delivered by the United States Postal Service and commercial foreign and interstate carriers according to the directions thereon, in violation of Title 18, United States Code, Section 1341, and (ii) to transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
(Securities Fraud)

45. The allegations contained in paragraphs 1 through 42 are realleged and incorporated as if fully set forth in this paragraph.

46.   On or about and between July 30, 2002 and December 2003, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant BRADLEY STINN, together with others, did knowingly and intentionally execute a scheme and artifice (a) to defraud persons in connection with securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, to wit: the Class A common stock of Friedman's Inc., and (b) to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, to wit: the Class A common stock of Friedman's Inc.

(Title 18, United States Code, Sections 1348, 2 and 3551 et seq.)

COUNT THREE
(False SEC Filing)

47.   The allegations contained in paragraphs 1 through 42 are realleged and incorporated as if fully set forth in this paragraph.

48.   On or about August 13, 2002, within the Southern District of New York, the defendant BRADLEY STINN, together with others, did unlawfully, willfully, and knowingly make and cause to be made statements in a report and document required to be filed

with the SEC under the Securities Exchange Act of 1934 and the
rules and regulations promulgated thereunder, to wit, Form 10-Q
for Friedman's quarter ended June 29, 2002, which statements were
false and misleading with respect to material facts.

(Title 15, United States Code, Sections 78m(a) and 78ff;
Title 18, United States Code, Sections 2 and 3551 et seq.)

<u>COUNT FOUR</u>
(False SEC Filing)

49.   The allegations contained in paragraphs 1 through
42 are realleged and incorporated as if fully set forth in this
paragraph.

50.   On or about December 20, 2002, within the Southern
District of New York, the defendant BRADLEY STINN, together with
others, did unlawfully, willfully, and knowingly make and cause to
be made statements in a report and document required to be filed
with the SEC under the Securities Exchange Act of 1934 and the
rules and regulations promulgated thereunder, to wit, Form 10-K
for Friedman's fiscal year ended September 28, 2002, which
statements were false and misleading with respect to material
facts.

(Title 15, United States Code, Sections 78m(a) and 78ff;
Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT FIVE
(Mail Fraud)

51.  The allegations contained in paragraphs 1 through 42 are realleged and incorporated as if fully set forth in this paragraph.

52.   In or about September 2003, within the Eastern District of New York and elsewhere, the defendant BRADLEY STINN, together with others, did knowingly and intentionally devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, and attempting to do so, did cause to be placed in a post office and authorized depository for mail, matters and things to be sent and delivered by the United States Postal Service and commercial foreign and interstate carriers, to wit: a Prospectus Supplement relating to Friedman's offering of 3,100,000 shares of its Class A common stock.

(Title 18, United States Code, Sections 1341, 2 and 3551 et seq.)

## COUNT SIX
(Certification of a False Financial Report)

53.  The allegations contained in paragraphs 1 through 42 are realleged and incorporated as if fully set forth in this paragraph.

54.   On or about December 20, 2002, within the Southern District of New York, the defendant BRADLEY STINN, together with others, did knowingly and willfully certify a periodic report containing financial statements filed by an issuer, to wit: Friedman's Inc.'s Form 10-K for its fiscal year ended September 30, 2002, with the Securities and Exchange Commission pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934 knowing that the periodic report containing the financial statements did not fully comply with the requirements of Sections 13(a) and 15(d) of the Securities Exchange Act of 1934 and that the information contained in the periodic report did not fairly present, in all material respects, the financial condition and results of operations of the issuer, to wit: Friedman's Inc.

(Title 18, United States Code, Sections 1350(c)(2), 2 and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION
### FOR COUNTS ONE THROUGH SIX
(Conspiracy to Commit Securities Fraud, Mail Fraud and Wire Fraud; Securities Fraud; False SEC Filings; Mail Fraud; Certification of a False Financial Report)

55.   The United States hereby gives notice to the defendant that, upon his conviction of any of Counts One through Six, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property constituting or derived

24

from proceeds obtained directly or indirectly as a result of such offenses.

      56.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      (a)   cannot be located upon the exercise of due diligence;

      (b)   has been transferred or sold to, or deposited with, a third party;

      (c)   has been placed beyond the jurisdiction of the court;

      (d)   has been substantially diminished in value; or

      (e)   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any property of such defendant up to the value of the forfeitable property described in this forfeiture allegation, including but not limited to the following:

      (a)   any and all right, title and interest in the real property and appurtenances, improvements, fixtures, attachments, and easements known as 1350 W. Dry Creek Road, Healdsburg, California 95448, held in the name of Bradley Stinn; and

25

    (b)   any and all right, title and interest in the real
property and appurtenances, improvements, fixtures,
attachments, and easements known as 2355 Washington
Street, San Francisco, California 94115, held in
the name of Bradley Stinn.

    (Title 28, United States Code, Section 2461(c); Title

18, United States Code, Section 981(a)(1)(C); Title 21, United

States Code, Section 853)

                       A TRUE BILL

                       FOREPERSON

ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY:_____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136

F.#

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CRIMINAL CASE
INFORMATION SHEET

1.  Title of Case: <u>UNITED STATES v. BRADLEY STINN</u>

2.  Related Magistrate Docket Number(s):_____

    _____

    None ( )

3.  Arrest Date:_____

4.  Nature of Offense(s):    __✓__ Felony
                             _____ Misdemeanor

5.  Related Cases--Title and Docket No(s). (Pursuant to Rule 50.3 of
    the Local E.D.N.Y. Division of Business Rules)._____

        <u>UNITED STATES V. VICTOR SUGLIA 07-CR-033 (NG)</u>

    _____

6.  Projected Length of Trial:    Less than 6 weeks (X)
                                  More than 6 weeks ( )

7.  County in which cause of action arose: ____KINGS_____
    (Pursuant to Rule 50.1(d) of the Local EDNY Division of Business
    Rules)

8.  Has this indictment/information been ordered sealed? (X)Yes ()No

9.  Have arrest warrants been ordered? (X)Yes    ()No


                              UNITED STATES ATTORNEY

                         By: _____
                             SCOTT KLUGMAN
                             Assistant U.S. Attorney
                             (718) 254-6461