UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

    - against -                        07-CR-0113 (NG)

BRADLEY STINN,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X


### THE GOVERNMENT'S MEMORANDUM OF LAW IN
### RESPONSE TO THE DEFENDANT'S SENTENCING SUBMISSIONS

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York  11201


Scott Klugman
Ilene Jaroslaw
James McGovern
Assistant U.S. Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum in response to the defendant's sentencing submissions.  To date, the defendant has made two sentencing-related submissions.  The defendant submitted a letter to the Probation Department dated October 14, 2008, in which he objected to nearly every paragraph in the offense conduct and defendant participation section of the Presentence Investigation Report ("PSR").  On November 8, 2008, the defendant filed an "initial sentencing memorandum," in which he objected to all of the offense level enhancements contained in the PSR and suggested that he would make a further submission arguing for a non-Guidelines sentence.

For the reasons set forth below, the Court should adopt all of the factual findings contained in the offense conduct section of the PSR and should conclude that the Probation Department correctly calculated the defendant's effective advisory Guidelines range at 70 years, the maximum amount of incarceration permitted by the counts of conviction.  In addition, the government will not oppose a motion for a non-Guidelines sentence.  The government respectfully submits, however, that the section 3553(a) factors warrant the imposition of a sentence with a lengthy period of incarceration.

## **FACTUAL BACKGROUND**

During a six-week trial, the government proved that the defendant, while serving as the Chief Executive Officer at Friedman's Inc. ("Friedman's"), orchestrated a securities fraud scheme that made Friedman's reported financial data appear materially better than actual results. In furtherance of the scheme, the defendant lied on numerous occasions to Friedman's shareholders, its outside auditor, its Audit Committee, and analysts who covered Friedman's stock. The defendant also knowingly caused Friedman's to file materially false financial statements and other documents with the Securities and Exchange Commission.

A jury convicted the defendant on all three counts of the Second Superseding Indictment: (1) conspiracy to commit mail, wire and securities fraud, in violation of 18 U.S.C. § 1349; (2) securities fraud, in violation of 18 U.S.C. § 1348; and (3) mail fraud, in violation of 18 U.S.C. § 1341. The jury also found that, under the forfeiture allegation, the property that constituted or was derived from proceeds traceable to Counts One, Two and Three was a sum of money equal to $1,019,000.

I.      The Scheme to Defraud

The evidence at trial established that the defendant and his co-conspirators engaged in a scheme to misrepresent Friedman's true financial condition to the company's shareholders and the investing public. The government proved that, in furtherance of the scheme, the defendant caused Friedman's to file financial reports, and made other public statements on Friedman's behalf, that contained material misrepresentations and omitted facts necessary to make these statements truthful and not misleading. The evidence showed that these material misstatements and omissions related to three primary areas: (a) the operation of

3

Friedman's installment credit program; (b) Friedman's earnings; and (c) the delinquency and collectibility of Friedman's outstanding credit accounts.

A.     Misrepresentations Concerning Friedman's Installment Credit Program

Friedman's public filings, including its annual reports for 2001 and 2002 and a prospectus supplement sent to shareholders in September 2003, contained numerous materially false statements about the operation of Friedman's installment credit program.  These documents misrepresented that Friedman's had a standardized set of credit granting guidelines that were applied with few exceptions throughout Friedman's stores.  (GX 2 at S-6 to S-7; GX 16 at 24-25, F-6).[1]  Consistent with its public disclosures, the defendant also represented to shareholders and analysts that Friedman's credit-granting guidelines were applied consistently across the Friedman's chain.  (Stein at 3144; GX 36, at 6).

Contrary to the defendant's statements about Friedman's credit-granting practices and the statements in Friedman's public filings, Friedman's routinely extended credit to customers in violation of the company's guidelines.  (See, e.g., Greene 724-25, 753-56, 1190-1193; Milligan 2799-2804, 2842-43, 2849-51; GX 571A-571H, 727, 745, 835-871).  In fact, the evidence established there was a high percentage of exceptions to Friedman's guidelines and "blatant" noncompliance with Friedman's credit granting policies which had a "huge impact" on Friedman's bottom line.  (See, e.g., Greene 754-55, 1190-1193; Suglia 983-86; Mauro 2343-44; Milligan 2799-2804; Joseph 3600, 3693; Cook 3837-44).

---

[1]  References herein to "GX" and "DX" are to Government Exhibits and Defendant's Exhibits, respectively, marked or received in evidence at trial.  References to the trial transcript are designated by the last the name of the witness whose testimony is cited followed by the page number.  References to "GA" are to the appendix filed with this memorandum.

B.      Friedman's Earnings Were Materially Misstated

The evidence established that Friedman's earnings were materially misstated in multiple quarters from 2001 through 2003.  The defendant and his Chief Financial Officer, co-conspirator Victor Suglia, had a meeting every quarter at which the defendant decided the final earnings number that Friedman's would report for that period.  (Suglia 1007-08).  At these meetings, the defendant usually selected an earnings number that was as close to the consensus estimate, i.e., the average of the earnings estimates for all of the analysts that covered Friedman's, as he felt he could plausibly explain to Friedman's analysts.  (Suglia 1009).  The defendant typically caused Friedman's to report an earnings number that was higher than actual results, but in some cases, when Friedman's performance was better than expected, the defendant selected an earnings number that was lower than actual results and used the difference to create a rainy day fund for future quarters.  (Suglia 1009-13).  After the defendant selected Friedman's earnings number, Suglia and Mauro manipulated Friedman's accounting or "cook[ed] the books" in order to achieve the false earnings number selected by the defendant.  (Suglia 1009; Mauro 2338).

The evidence showed that the defendant and his co-conspirators used a variety of manipulations to falsify Friedman's earnings.  For example, Friedman's increased earnings in multiple reporting periods by millions of dollars through a practice known internally as "scooping."  (See, e.g., Stokum 655-62; Suglia 1016-18, 1045-46).  Pursuant to this practice, Friedman's improperly prevented millions of dollars in delinquent accounts from charging off each month by not booking the charge off at the end of the fiscal month and counting payments that came in after the close of the month as though they came in during that prior month.

(Stokum 655-62; Suglia 1016-18, 1045-46).  Absent scooping, Friedman's "would never come close to hitting" any of its earnings targets.  (Suglia 1017).

The defendant and his co-conspirators also materially overstated earnings in 2002 in connection with credit accounts referred to internally as the "x-files" or the "turd accounts." (See, e.g., Suglia 1238; Mauro 2372).  The x-files were comprised of approximately $7.9 million in extremely delinquent credit accounts that were being reported inaccurately because Friedman's computer system had not aged the accounts properly.  (Suglia 1238, 1247, 1251-59; Mauro 2371-72; GX 526, 572).  The defendant directed that the x-files be kept hidden from Friedman's independent auditor, its Audit Committee, its shareholders and the investing public. (See, e.g., Suglia 1302-06, 1358-80; Mauro 2383; Cruickshank 1949-50; Stein 3187; Parshall 3386-87; GX 42, 159, 279).  The defendant also directed that Friedman's manipulate its accounting to ensure that the x-files had no impact on Friedman's third quarter and fiscal year 2002 earnings.  (Suglia 1264-66, 1335-37, 1378-79, 1382-83; GX 25 at FRDM 266301; GX 165, 751, 1003).  Had the x-files been accounted for properly, Friedman's would have reported a loss for the third quarter 2002 instead of the approximately $2 million in profits that it actually reported.  (Mauro 2397; GX 25 at FRDM 266301; GX 572).  Similarly, Friedman's 2002 fiscal year income was overstated by millions of dollars as a result of the failure to account for the x-files correctly.  (Suglia 1333-38, 1352, 1505; Mauro 2397; GX 536, 680).

The defendant and his co-conspirators also materially improved reported earnings by manipulating Friedman's allowance for doubtful accounts, i.e., the company's estimate of the uncollectible portion of its accounts receivable.  (Pan 572-73; Suglia 990-91).  Rather than accurately estimating its projected losses, Friedman's used its allowance for doubtful accounts as

an earnings-management tool.  (Suglia 1016, 1062-73).  The manipulation of the allowance for

doubtful accounts at the end of Friedman's fiscal year was particularly egregious because the

defendant mandated that Friedman's always report the year-end allowance at 10% of total

accounts receivable, regardless of the true uncollectibility of Friedman's credit portfolio.  (Suglia

1094-97, 1347-51; Mauro 2398-99).  This percentage was so far below the amount that

Friedman's should have reserved that Suglia had to create a fabricated analysis in order to

obfuscate the state of Friedman's reserves from the Ernst & Young auditors.  (Suglia 1097-99).

Using this fabricated analysis, Friedman's understated its allowance for doubtful accounts by

over $5 million in both 2001 and 2002, which had the direct effect of inflating reported pre-tax

income by that same amount.  (Suglia 1097-99, 1347-51, 1356-58; GX 525, 532, 536).

   Concerned that Ernst & Young would advise Friedman's to increase its 2003 year

end allowance, the defendant decided to publicly announce in a July 2003 press release that

Friedman's expected its 2003 fiscal year end allowance to be 10.5%.  (Suglia 1460-64; GX 175).

Significantly, no analysis was performed to support this number; rather, the defendant made this

decision in an effort to "back EY, Ernst & Young, into a corner in the sense that if they wanted

to propose anything higher related to the fiscal year end, it would be difficult for them to do

since we had publicly come out and reported the allowance would be 10.5. percent."  (Suglia

1460-64).   Following the government's announcement of its investigation,

Friedman's disclosed that the false 10.5% expectation was millions of dollars too low.  On

November 11, 2003, Friedman's issued a press release announcing that it expected its allowance

for doubtful accounts reserve to be in the range of 14% to 17% of total accounts receivable, not

the 10.5% reserve that had been disclosed in the July 2003 press release.  (GX 182).  Friedman's

7

issued a subsequent press release on November 17, 2003, that announced that it expected its 2003 year end allowance for doubtful accounts to exceed 17%.  (GX 51).

* * *

Each of the aforementioned accounting manipulations, as well as others, hid from Friedman's shareholders the significant problems that Friedman's had with its credit portfolio, which were caused by the widespread failure of Friedman's sales personnel to follow the credit-granting guidelines.  The net impact of these manipulations was the improper deferral of millions of dollars of write offs and other expenses from Friedman's 2002 fiscal year into its 2003 fiscal year.  (Suglia 1503-06).  In fact, a retrospective study of the performance of Friedman's credit portfolio showed that Friedman's 2002 reported pre-tax income (approximately $35 million) was actually overstated by $30 million.  (Suglia 1486-88, 1503-06; GX 671).  In addition, the defendant and his co-conspirators planned improperly to defer into fiscal year 2004 an even larger amount of charge offs and other expenses that should have been recognized during 2003 through scooping, manipulating the allowance for doubtful accounts and other manipulations.  (Suglia 1503-06).

C.    The Collectibility of Friedman's Outstanding Credit Accounts
      Was Materially Misrepresented to Friedman's Shareholders

Friedman's also materially misstated in multiple reporting periods three key metrics which shareholders and investors used to assess the delinquency and collectibility of Friedman's credit portfolio:  the allowance for doubtful accounts percentage, the "currency percentage," i.e., the percentage of its accounts receivable that was less than 30 days past due, and the "delinquency percentage," i.e.,the percentage of its accounts receivable that was greater than 90 days past due.  These misstatements had the purpose and effect of making it appear that

8

Friedman's credit portfolio was much more collectible than it in fact was.  For example, as discussed in the preceding section, the defendant and his co-conspirators caused Friedman's to understate its allowance for doubtful accounts percentage in multiple quarters.  Friedman's also falsely inflated its currency percentage and artificially lowered its delinquency percentage in multiple quarters through scooping and deliberately misaging the x-files.  (Suglia 1039, 1067, 1280-82, 1294-96; Mauro 2330-31, 2337; GX 730, 824).

II.    The Conspirators' Compensation

The defendant and Friedman's other senior executives did not have the authority to award compensation to themselves during the time period of the conspiracy.  (Cruickshank 1951-52).  Instead, Friedman's had a Compensation Committee of its Board of Directors whose role was to establish the compensation for Friedman's top executives, including the defendant. (Cruickshank 1951-52).  Robert Cruickshank was the Chairman of the Compensation Committee during the period of the conspiracy.  (Cruickshank 1951-52).

At trial, Cruickshank testified about the manner in which the Compensation Committee established executive compensation for Friedman's 2002 and 2003 fiscal years.  For the 2002 fiscal year, the Compensation Committee met in the fall of 2001 to establish executive compensation.  (Cruickshank 1953-56).  At that time, the Compensation Committee set the salaries for Friedman's four most senior executives.  (Cruickshank 1956).  The Compensation Committee also approved a merit-based bonus structure for these executives for the 2002 fiscal year that was tied directly to Friedman's earnings-per-share.  (Cruickshank 1955-56; GX 518). As a result of Friedman's falsely reported 2002 financial performance, all four of these executives qualified for a performance bonus at the end of Friedman's 2002 fiscal year.  In fact,

Friedman's paid these executives a total of $861,000 in bonus compensation based on Friedman's overstated earnings in 2002 ($352,000 to the defendant, $272,000 for Sterling Brinkley, $137,000 to Suglia and $100,000 to Douglas Anderson). (Cruickshank 1957-59; GX 252, 515, 778). Absent the scheme to defraud, none of the executives would have received a bonus for the 2002 fiscal year. (See, e.g., Suglia 1396-1400; GX 778).

Based on Friedman's overstated earnings, the Compensation Committee also gave Friedman's top executives a substantial salary raise for 2003, including a $300,000 raise for the defendant. (Cruickshank 1959-61; GX 252, 515). Mr. Cruickshank testified the decision to grant the defendant such a large raise was based on the Committee's belief that "the company was doing very well and that it reflected a lot of the efforts of Brad Stinn." (Cruickshank 1961). The Committee again adopted a merit-based bonus structure for the defendant and three other senior executives for Friedman's 2003 fiscal year. (Cruickshank 1964-65; GX 519).

At the end of Friedman's 2003 fiscal year, prior to the disclosure of the government's investigation into Friedman's accounting, the defendant directed Suglia to prepare a chart setting forth the performance bonus calculation for the defendant and the three other executives. (Suglia 1549-50; GX 872). This calculation determined that the defendant and the other executives were entitled to a performance bonus equal to 21.4 percent of their base salary based on the fraudulent earnings number that the conspirators planned to have Friedman's report for the 2003 fiscal year. (Suglia 1549-51; GX 872). Based on this analysis, Friedman's would have paid its senior executives a total of $438,700 in performance bonuses for 2003. (See GX 252; 872). Both the chart and a draft memorandum from the defendant to the Compensation Committee requesting a 2003 bonus were found in the defendant's files. (GX 872, 873). Absent

10

the scheme to defraud, none of the executives would have received a bonus for 2003. (Suglia 1552; GX 31, 872).

Moreover, the defendant and his co-conspirators used the scheme to defraud to cover up approximately $696,000 in unauthorized tax payments that the defendant caused Friedman's to pay on behalf of himself and other members of the conspiracy.  (See, e.g., Suglia 1441-43; Cruickshank 1963-64; Mauro 2413-17, 2680-81).

III.   Friedman's Stock Price

Following the government's announcement of its investigation, Friedman's made a series of public disclosures concerning its financial problems and other issues that arose as a direct result of the scheme to defraud.  These disclosures caused a significant drop in Friedman's stock price.  In fact, in the 14 months following the government's announcement of its investigation into Friedman's accounting issues, Friedman's stock price lost approximately 95% of its value before the company ultimately filed for bankruptcy on January 14, 2005.

As referenced above, on November 11, 2003, Friedman's issued a press release and filed a corresponding Form 8-K with the Securities and Exchange Commission entitled "Friedman's Announces Planned Increase in Allowance for Doubtful Accounts, Management Change and Other Matters."  (GX 50, 182).  In this release, Friedman's announced that (1) it expected its allowance for doubtful accounts reserve to be in the range of 14% to 17% of total accounts receivable, not the 10.5% reserve that had been disclosed in the July 2003 press release, which was expected to lower reported earnings by approximately $0.23 to $0.43 per share; (2) the company placed Suglia on a leave of absence; and (3) the Department of Justice and the SEC

had expanded their investigations to include a review of Friedman's allowance for doubtful accounts and other financial matters.  (GX 50, 182).

The reaction of the market to this press release was swift and immediate.  On the first day of trading following the issuance of this release (November 12, 2003), Friedman's stock price lost 39% of its value, dropping from the November 11 closing price of $12.00 per share to $7.30 per share.  (GX 903).  Moreover, Friedman's share volume on that day alone was 2,238,158.  (GX 903).  To put this in perspective, during the entire month that preceded the issuance of this release, including the days in which Friedman's issued a press release, Friedman's share volume averaged only approximately 30,000 per day and no day exceeded more than 60,000 shares traded.  (GX 903).

Less than a week later, Friedman's issued another press release and filed a corresponding Form 8-K with the SEC announcing additional problems with its financial statements as a result of the fraud.  On November 17, 2003, Friedman's announced that the company's historical financials for at least the fiscal years 2000, 2001, 2002 and the first three fiscal quarters for 2003 would be restated and should no longer be relied upon.  (GX 51).  Friedman's also announced that it now expected its 2003 fiscal year end allowance for doubtful accounts to exceed 17%.  (GX 51).  In addition, Friedman's announced that as a result of the restatement, the filing of its Form 10-K for its 2003 fiscal year would be delayed.  (GX 51).

Once again, Friedman's stock price dropped significantly on the first day of trading following the issuance of this release.  Whereas Friedman's stock price closed at $7.38 per share on November 17, 2003, the price dropped to $6.06 per share as of the close of November 18, 2003, with 1,113,017 shares traded.  (GX 903).  The stock continued its

12

downward trend for the next several days before rebounding the following week.  (GX 903).  As of December 1, 2003, Friedman's stock was trading at $6.90 per share.  (GX 903).

Over the next several months, Friedman's issued a number of releases announcing corporate and other changes that resulted from the uncovering of the scheme to defraud.  On December 2, 2003, Friedman's announced, inter alia, that the defendant resigned from his positions as Chief Executive Officer and member of the Board of Directors, that its Board elected Robert Cruickshank as non-executive Chairman and Richard Cartoon Interim Financial Consultant and that the company formed an Office of the Chairman comprised of Cruickshank, Cartoon and Anderson to oversee the day-to-day operations of the company.  (GX 52).  On December 8, 2003, Friedman's announced that it had elevated Cartoon to the position of Chief Financial Officer, and that Suglia, who had been placed on a leave of absence, had resigned. (GA 6 (Tab 1)).  Several weeks later, on December 23, 2003, Friedman's announced that Sterling Brinkley resigned his positions as an executive officer and member of the Board of Directors. (GA 12 (Tab 2)).

On December 29, 2003, Friedman's issued a press release and filed a corresponding Form 8-K with the SEC which announced a further delay in the filing of the 2003 Form 10-K as a result of the previously disclosed restatement, investigations by the SEC and the Department of Justice and the continuing audit committee investigation.  (GA 15-19 (Tab 3)). While the company stated that it expected to file its 2003 Form 10-K by the end of February 2004, it announced that it expected to provide preliminary financial information for the restated periods and its 2003 fiscal year prior to that time.  This release also announced that Friedman's was notified by its lenders that it was in default under certain provisions of its credit agreement.

13

(GA 18).  In fact, one of the defaults stemmed from Friedman's failure to provide the lenders an annual financial statement within 90 days after the close of its fiscal year.  (See DX 4112, p. 69, § 6.1(a)).

During the month of December, Friedman's stock price trended downward before rebounding slightly.  (GX 903).  Between December 1 and December 10, the closing price for Friedman's stock lost approximately $1.00 in value.  (GX 903).  For the remainder of the month, Friedman's stock price trended upward or remained stable, and the stock closed at $6.71 per share on December 31, 2003.  (GX 903).  During the entire month of December, Friedman's stock never traded at or above $7.00, and the high closing price was the price on December 1 of $6.90 per share.  (GX 903).

On January 7, 2004, Friedman's announced its sales results for its first fiscal quarter of 2004, which ended on December 27, 2003.  (GA 24 (Tab 4)).  That release disclosed that despite the corporate unrest caused by the fraud, both Friedman's total net sales and comparable store sales increased over the first quarter of the prior year.  (GA 24).  According to the release, "[n]et sales for the quarter increased 6.3%, to $210.6 million compared to $198.1 million during the comparable period last year.  Comparable store sales increased 2.7% during the quarter."  (GA 24).  As a result of the positive news, Friedman's stock price traded over $7.00 for the first time since the November 17 release.  (GX 903).  Whereas Friedman's closed at $6.87 per share on January 7, it closed at $7.45 per share on January 8.  (GX 903).

On February 27, 2004, Friedman's issued a press release in which inter alia, it announced positive sales news for the Valentine's Day sales period and a further delay in filing its 2003 Form 10-K.  As to the former, Friedman's announced a 5.6% comparable store sales

14

increase for February 2004 versus February 2003.  (GA 22 (Tab 4)).  Similarly, Friedman's

comparable store sales as of that date for its second quarter 2004 improved an estimated 4.7%

over the same period in 2003.  (GA 22).

> The February 27 press release further stated:
>
> The Company also said that it will not meet its previously
> announced plan to file its annual report on Form 10-K for the fiscal
> year ended September 27, 2003 by the end of February, 2004.
> Friedman's attributed the delay to several factors, including: the
> extent of work involved in the preparation of restated historical
> financial statements for the fiscal years 2001 and 2002 and for the
> first three quarters of fiscal year 2003; completion of the audit of
> the financial statements by Ernst & Young LLP, independent
> auditor to the Company; and the previously disclosed ongoing
> investigations by the Securities and Exchange Commission and the
> Department of Justice. The Company will file its restated financial
> statements with its annual report on Form 10-K promptly upon
> completion of the audit. The Company will not be able to file its
> quarterly report on Form 10-Q for the quarter ended December 27,
> 2003 until after filing the annual report on Form 10-K. With regard
> to the restatement of the financial statements, the Company
> clarified that while the principal reason for the restatement was
> concern over the accounting for the allowance for doubtful
> accounts, in the process of preparing the restatement the Company
> has identified several other areas that will be adjusted including
> inventory, accounts payable and accrued liabilities.

(GA 22-23).

Between January 8 and February 2004, Friedman's stock price closed consistently

in the $7 to $8 range.  (GX 903).  During that time frame, Friedman's closing price achieved a

high of $7.86 per share on January 9, the second day of trading after the issuance of the release

disclosing positive sales news for the Christmas quarter.  (GX 903).  By the last day of trading in

February, Friedman's stock price closed at $7.24 per share.  (GX 903).  As March 2004 started,

Friedman's stock price started to decrease slightly again.  By March 15, 2004, Friedman's stock price closed at $6.51 per share.  (GX 903).

On March 15, 2004, Friedman's announced more bad news, disclosing that Ernst & Young resigned as the independent accountant for its West Coast affiliate, Crescent Jewelers.  (GA 26-28 (Tab 5)).  Friedman's also disclosed that in connection with the audit of its own 2003 financial statements, it retained an outside appraisal firm to provide a valuation of Friedman's investment in Crescent.  (GA 27).  The release further stated that while the valuation had yet to be completed, Friedman's expected to record a "substantial impairment" of its investment in Crescent in its 2003 financial statements and that the financial information for Crescent previously included in its public filings "should no longer be relied upon."  (GA 27).  Notably, the defendant served as CEO of Crescent up until December 2003.  (PSR ¶ 9).[2]  On the next day of trading after the issuance of this release, March 17, 2004, Friedman's stock fell by $0.76 to close at $5.75 per share.  (GX 903).   Although the stock price rebounded to $6.13 on March 18, 2003, Friedman's stock price closed below $6.00 on all but a few days during the last weeks in March and the entire month of April 2004.  (GX 903).  By April 30, 2004, Friedman's stock closed at $5.01 per share.  (GX 903).

On the first day of trading in May 2004, Friedman's stock closed below the $5.00 level for the first time since January 2001.  On May 3, 2004, Friedman's stock closed at $4.59.

---

[2]  Several witnesses indicated that, at the defendant's direction, Crescent's EBITDA (earnings before interest, taxes, depreciation and amortization) was manipulated in order to hit Crescent's lending covenants and in furtherance of the defendant's goal ultimately to merge Friedman's and Crescent.  (See 3500-JS-4, at 3-4; 3500-VS-24, at 2-3).

(GX 903).  The stock rebounded over the next two days and closed at $5.00 on May 5, 2004.  (GX 903).

At that time, several significant events occurred.  On May 5, Friedman's issued two press releases.  (GA 46-53 (Tab 10)).  One release announced that the holder of Friedman's non-public shares amended and restated the bylaws of the company, named five new directors to the Board of Directors, and removed one Board member.  (GA 51).  The effect of this change was to rescind certain corporate governance amendments that had been adopted by the Board on April 29, 2008.  (See GA 51, GA 33-42 (Tab 7)).  The other release announced that Richard Cartoon resigned from his positions of CFO and Treasurer.  (GA 53).  Based on the two press releases, as well as the fact that Friedman's had still not filed its 2003 Form 10-K, the New York Stock Exchange commenced a trading halt of Friedman's stock on May 6, 2003.  (GA 43 (Tab 8); GA 44 (Tab 9)).  The New York Stock Exchange converted the temporary trading halt into a suspension and delisting on May 11, 2004.  (GA 43).  By that time, two of the five newly appointed directors had resigned.  (GA 43).

Friedman's stock resumed trading on May 11, 2004, on the pink sheets.  (GX 903).  Friedman's stock closed at $2.10 per share on that date.  (GX 903).  From that time forward, Friedman's stock never traded above $4.00.  (GX 903).

Friedman's never did file its Form 10-K for 2003 and never filed restated financial statements.  Friedman's stock price continued to fall over the coming months.  (GX 903).  On January 14, 2005, Friedman filed a voluntary petition for bankruptcy under Chapter 11.  (GA 62-67 (Tab 13).  As of that date, Friedman's stock closed at $0.62 per share.  (GX 903).

17

On or about December 9, 2005, Friedman's emerged from bankruptcy as a private company, wiping out all remaining shareholder value.

IV.     The PSR's Guidelines Calculation

The Probation Department grouped Counts One, Two and Three and concluded that the following Guidelines analysis applied to these offenses: (1) a base offense level of six (U.S.S.G. §§ 2X1.1, 2B1.1.); (2) a 26-level enhancement because the loss exceeded $100 million (U.S.S.G. § 2B1.1(b)(1)(N)); (3) a six-level increase because the offense involved more than 250 victims (U.S.S.G. § 2B1.1(b)(2)(C)); (4) a two-level enhancement because the offense involved sophisticated means (U.S.S.G. § 2B1.1(b)(8)(C)); (5) a four-level enhancement because the defendant was the CEO of a publicly-traded company (U.S.S.G. § 2B1.1(b)(13)); and (6) a four-level enhancement for leadership role (U.S.S.G. § 3B1.1(a)).  (PSR ¶¶ 82-98).  This calculation yielded a total offense level of 48.  (Id.)  Given that this offense level yields a Guidelines range of life for individuals in Criminal History Category I, the Probation Department calculated the defendant's effective Guidelines range to be 70 years, the maximum statutory sentence authorized for the counts of conviction.  (PSR ¶ 145-46).

**ARGUMENT**

POINT ONE

THE COURT SHOULD ADOPT THE FINDINGS FACT CONTAINED IN
THE PSR CONCERNING THE OFFENSE CONDUCT IN THEIR ENTIRETY

As noted above, the defendant submitted a letter to the Probation Department in which, inter alia, he objected to nearly every paragraph in the offense conduct and defendant participation section of the PSR.  (Def. October 14, 2008 Ltr.).   The defendant's objections can be broken down into four categories.

First, the defendant objects to the employment history of the conspirators (Def. October 14, 2008 Ltr. ¶¶ 9-11).  The Court should reject the objections to the defendant's and Suglia's employment history, which was taken directly from Friedman's 2003 proxy statement as well as other public filings.  (GX 6, at 4 (stating that the defendant served as Chairman of the Executive Committee of the Board of Directors since July 1998 and that Suglia served as Crescent's Chief Financial Officer since September 1999)).  As the defendant correctly points out, Mauro started as Friedman's Controller in January 1999, not December 1998.  (Mauro 2309).  The government agrees that this change should be made to PSR ¶ 11.

Second, the defendant objects to Probation's description of offense conduct underlying his convictions in this case.  (Def. October 14, 2008 Ltr. ¶¶ 3, 5, 12-40, 46-47, 56). In raising these objections, the defendant's letter contains no citations to the record.  Based on the summary of evidence set forth above, as well as the more thorough discussion of the trial evidence contained in the government's response to the defendant's post-trial motions, the Court

should adopt the factual findings contained in Offense Conduct section of the PSR in their entirety.[3]

Third, the defendant objects to the "Offender Characteristics" section of the PSR, which details his personal history (Def. October 14, 2008 Ltr. ¶¶ 49-55, 57-60). The government takes no position as to these objections.

Finally, consistent with his arguments in his initial sentencing memorandum, the defendant objects to the Guidelines and restitution calculation in the PSR. (Def. October 14, 2008 Ltr. ¶¶ 41-45, 48, 61). For the reasons stated in the following sections, the Court should reject each of these objections and adopt the Guidelines calculation set forth in the PSR.

---

[3] Given the Court's familiarity with this case and the fact that the government set forth a more fulsome discussion of the evidence presented at trial in its Memorandum of Law in Opposition to the Defendant's Rule 29 and Rule 33 Motions (hereinafter "Gov. Rule 29/33 Mem"), the government has only included a summary of the trial evidence in this memorandum. At the Court's request, the government will submit further briefing in support of any of the facts set forth in the Probation Department's description of the offense conduct in this case.

20

POINT TWO

THE PROBATION DEPARTMENT CORRECTLY CALCULATED
THE DEFENDANT'S GUIDELINES RANGE IN THE PSR

Although the Sentencing Guidelines are now advisory pursuant to United States

v. Booker, 543 U.S. 220, 245 (2005), they continue to play a "key role" in federal sentencing.

United States v. Kimbrough, ___ U.S. ___, 128 S.Ct. 558, 574 (2007).  Indeed, the Supreme

Court has made clear that "a district court should begin all sentencing proceedings by correctly

calculating the applicable Guidelines range.  Gall v. United States, __ U.S. __, 128 S.Ct. 586,

596 (2007).  A district court then "must treat the Guidelines as the 'starting point and the initial

benchmark'" for its sentencing determination.  Kimbrough, 128 S.Ct. at 574 (quoting Gall, 128

S.Ct. at 596).

In his initial sentencing memorandum, the defendant objects to each of the

enhancements over and above the base offense level.  In addition to raising specific objections to

the enhancements, the defendant objects generally to all of the enhancements on the ground that

the Court cannot impose any enhancements because they are not specifically based on facts

found by the jury.  As discussed in more detail below, the defendant's objections are meritless,

and the Court should conclude that the Probation Department correctly calculated the

defendant's Guidelines range.

A.      This Court Should Reject the Defendant's
        Assertion that Any Guidelines Enhancements
        Must Be Based on Jury Factfinding

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the

federal sentencing scheme then in existence was unconstitutional under the Sixth Amendment

because it required the imposition of an enhanced sentence under the United States Sentencing

21

Guidelines based on factual findings made by a sentencing judge.  Id. at 226-44.  The Court considered several remedies for this violation, including maintaining the Sentencing Reform Act as written by Congress with the addition of jury factfinding of Guidelines enhancements.  Id. at 245-67.  The Court, however, rejected the addition of jury factfinding and instead severed and excised two provisions of Sentencing Reform Act that related to the mandatory use of the Guidelines at sentencing.  Id.

As a result of these modifications, the United States Sentencing Guidelines are now advisory at sentencing.  Id. at 245.  By preserving all but the two excised provisions of the Sentencing Reform Act, the Court left in place judicial factfinding of the applicable Guidelines range.  As this Court has stated,

> [t]he applicable Guidelines range is normally to be determined in the same manner as before Booker/Fanfan. . . .  Thus, the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence.

United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005).

Accordingly, pursuant to Booker and its progeny, the Court, not the jury, is the ultimate finder of fact for the purpose of calculating the defendant's advisory Guidelines range.  This Court should therefore reject the defendant's assertion that it cannot apply any of the sentencing enhancements because the government did not charge them in the indictment and submit them to the jury in a special verdict form.

Moreover, it bears noting that, although not controlling, the jury did make one finding that pertains to the sentencing enhancements.  The jury ordered that the defendant forfeit $1,019,000.  (Tr. at 4750).  In so doing, the jury necessarily found, by a preponderance of the

22

evidence, that the defendant and his co-conspirators wrongfully obtained that amount from Friedman's as a result of their commission of the offenses of conviction.  (See Tr. at 4727-31).  While this Court is certainly not bound by this determination at sentencing, see, e.g., United States v. Washburn, 444 F.3d 1007, 1014 (8th Cir. 2006) (concluding  that jury's finding on amount of loss was "mere surplusage"); United States v. Magallanez, 408 F.3d 672, 685 (10th Cir. 2005) ("when a district court makes a determination of sentencing facts . . . under the now-advisory Guidelines, it is not bound by jury determinations"), the defendant's claim that the jury did not make any findings that pertain to the loss enhancement is erroneous.

B.      The Probation Department Correctly Calculated
        the Defendant's Advisory Guidelines Range

        1.      The PSR Loss Calculation Is Correct

                Section 2B1.1(b) of the United States Sentencing Guidelines requires the Court to enhance a defendant's sentence based on the amount of "loss."  The commentary to that section defines loss as the greater of the "actual loss," i.e., "the reasonably foreseeable pecuniary harm that resulted from the offense," or "intended loss," i.e., "the pecuniary harm that was intended to result from the offense."  U.S.S.G. § 2B1.1 cmt. n.3(A).  In addition, the Guidelines require only that the Court make a "reasonable estimate of the loss."  U.S.S.G. § 2B1.1 cmt. n.3(C) (noting that the sentencing judge is uniquely positioned to make this determination and is entitled to appropriate deference).  In cases where a reasonable estimate of loss is not possible, the Court should use the gain that resulted from the offense as an alternative measure of loss.  U.S.S.G. § 2B1.1 cmt. n.3(B); see United States v. Rosen, 409 F.3d 535, 550-51 (2d Cir. 2005) (observing that "the court may instead measure loss by reference to the defendant's gains, although using a

gain as a basis 'ordinarily will underestimate the loss'") (quoting 1995 U.S.S.G. § 2F1.1 cmt. n.8) .

There are three components to the government's loss calculation in this case: (1) losses caused to Friedman's shareholders; (2) compensation paid to the defendant and his co-conspirators as a result of the fraud; and (3) reasonably foreseeable expenses that Friedman's incurred as a result of the fraud.

      a.    <u>Shareholder Losses</u>

In securities fraud cases, "loss" under Guidelines Section 2B1.1(b) includes losses resulting from a decline in stock price "suffered by those investors who bought or held . . . stock during the fraud period either in express reliance on the accuracy of the financial statements or in reliance on what <u>Basic, Inc. v. Levinson</u> described as the 'integrity' of the existing market price." <u>United States v. Ebbers</u>, 458 F.3d 110, 126-27 (2d Cir. 2006) (citing <u>Basic</u>, 485 U.S. 224, 247 (1988)).  While acknowledging that this determination is not an exact science, <u>United States v. Rutkoske</u>, 506 F.3d 170, 179 (2d Cir. 2007), the Second Circuit has stressed that "some estimate [of shareholder loss] must be made for Guidelines' purposes, or perpetrators of fraud would get a windfall." <u>Ebbers</u>, 458 F.3d at 127.  Thus, the Second Circuit has made clear that a sentencing court must make a reasonable estimate of the portion of a decline in share price caused by the fraud and exclude from the loss calculation the portion of the decline in share price that resulted from other factors.  <u>Rutkoske</u>, 506 F.3d at 179; <u>Ebbers</u>, 458 F.3d at 128.

In making this determination, the Second Circuit has directed that courts should look to the principles governing recovery of damages in civil securities fraud, specifically, the civil concept of "loss causation."  <u>See</u> <u>Rutkoske</u>, 506 F.3d at 179 (but stating that the

"Guidelines allowance of a 'reasonable estimate' of loss remains pertinent").  The leading case in the Second Circuit on civil "loss causation" is Lentell v. Merill Lynch & Co., Inc., 396 F.3d 161 (2d Cir. 2005).  In Lentell, the Second Circuit likened loss causation to the tort-law concept of proximate cause which requires a plaintiff to show that the damages incurred were a foreseeable consequence of any misrepresentation or material omission.  Id. at 172.  The court noted, however, that this was an imperfect analogy because "it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated."  Id. at 173.  By concealing relevant information from the market, a misstatement or omission creates a "zone of risk" and is the proximate cause of all investment losses caused by the materialization of risks concealed within that zone.  Id.  Thus, to establish loss causation, a civil plaintiff need only show that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  Id.

While the determination of the entirety of shareholder losses is generally "no easy task," the Second Circuit has provided guidance on the manner in which a sentencing court may simplify the loss determination under the Guidelines.  See Rutkoske, 570 F.3d at 179; Ebbers, 458 F.3d at 128.  In Rutkoske, the court summarized this simplified Guidelines loss determination as follows: "cases might arise where share price drops so quickly and so extensively immediately upon disclosure of a fraud that the difference between pre- and post-disclosure share prices is a reasonable estimate of loss caused by the fraud."  506 F.3d at 179.

Similarly, the Second Circuit approved the sentencing court's use of a simplified loss calculation in Ebbers.  In that case, the district court calculated loss by multiplying the total

25

number of shares held by non-conspirators by the total drop in stock price during the six days following the company's announcement that its accounting was improper and restatement of its results.  458 F.3d at 128.  The district court then reduced this number to reflect the fact that the government conceded that some of the price decline was attributable to factors unrelated to the fraud that were announced during the time period in question.  Id.  The Second Circuit found the district court's loss calculation to be reasonable because the district court's loss amount was ten times greater than the threshold for the Guidelines provision used by the district court and because this loss amount in all probability understated the true amount of loss incurred by the company's shareholders.  Id.

(1) <u>The Government's Loss Calculation</u>

In the present case, the Court should adopt the government's proposed loss calculation, which is based on the principles announced in <u>Rutkoske</u> and <u>Ebbers</u>.  The government's loss calculation is based on the price drop that occurred immediately after Friedman's made two disclosures of information that had been concealed as a result of the fraud, namely, that its allowance for doubtful accounts would be significantly higher than previously announced and that its financial statements for the preceding two years were inaccurate.

The government proved that one of the primary purposes of the scheme to defraud was to enable Friedman's to report an artificial earnings number that was handpicked by the defendant.  Instead of reporting earnings based on actual results, the defendant selected an earnings number that was as close to the consensus estimate as the defendant felt he could plausibly explain to Friedman's analysts.  (<u>See</u>, <u>e.g.</u>, Suglia 1007-09).  Because the defendant's earnings number typically exceeded Friedman's actual results, he directed Friedman's

accounting department to manipulate the accounting to achieve his desired result.  (See, e.g., Suglia 1009; Mauro 2338).  Multiple witnesses and documents showed that Friedman's reported earnings in its 2001 and 2002 annual financial statements and its 2003 quarterly financial statements were materially misstated due to scooping, improperly accounting for the x-files, manipulation of Friedman's allowance for doubtful accounts, and other manipulations.  See Gov. Rule 29/33 Mem. at 9-24.

   The Court should also find that the defendant specifically directed that Friedman's falsely pre-announce its expected 2003 fiscal year end allowance in a July 2003 press release.  Both testimonial and documentary evidence established that the defendant mandated that Friedman's always report the year-end allowance at 10% of total accounts receivable, regardless of the true uncollectibility of Friedman's credit portfolio.  (Suglia 1094-97, 1347-51; Mauro 2398-99; GX 875).  As directed by the defendant, Friedman's reported an artificially low year-end allowance reserve of 10% of total accounts receivable for both fiscal years 2001 and 2002.  (GX 12 at 6, 16 at 6, 532, 536).

   After Ernst & Young questioned the validity of the methodology used to calculate the 2002 year-end allowance, the defendant became concerned that Ernst & Young would advise Friedman's to increase its 2003 year end allowance.  (Suglia 1417-23, 1460-64; GX 175, 467). As a result, the defendant decided to publicly announce in a July 2003 press release that Friedman's expected its 2003 fiscal year end allowance to be 10.5%.  (Suglia 1460-64; GX 175). Significantly, no analysis was performed to support this number; rather, the defendant made this decision in an effort to "back EY, Ernst & Young, into a corner in the sense that if they wanted to propose anything higher related to the fiscal year end, it would be difficult for them to do

since we had publicly come out and reported the allowance would be 10.5. percent." (Suglia 1460-64). Evidencing his consciousness of guilt, the defendant wrote the quote in the press release pertaining to the pre-announcement, but attributed it to Suglia. (Suglia 1462; GX 175). The defendant issued this release over the objection of Ernst & Young. (Suglia 1466; Mauro 2431-33). In addition, the defendant provided Suglia with a series of false talking points to be used on the analyst call that quarter to justify the announced increase, as well as the reserve that quarter. (Suglia 1467-70; GX 662, 663). The defendant and Suglia repeatedly lied to shareholders and analysts on the quarterly earnings call using the defendant's talking points. (Suglia 1470- 76; GX 46 at 36193-94, 36214-17).

Thus, the November 11 and 17 press releases made certain disclosures to the market that had been concealed by the scheme to defraud and other negative disclosures that resulted from the unraveling of the scheme to defraud. First, these press releases disclosed that the Friedman's 2003 year end allowance would be much higher than 10.5%. In the November 11 release, Friedman's disclosed that it expected its 2003 year-end allowance to be in the range of 14% to 17% of total accounts receivable, not the 10.5% that had been announced in the July 2003 press release; consequently, earnings-per-share would be reduced by approximately $0.23 to $0.43. (GX 50). The November 17 release announced that Friedman's believed that its 2003 year-end allowance would exceed 17%. (GX 51). Because the defendant deliberately pre-announced a year-end allowance that he knew to be too low in the July 2003 press release, the Court should find that the portions of the press releases that relate to the allowance for doubtful accounts disclosed information that had been concealed from the market as a result of the fraud.

Second, the November 17 release announced that Friedman's planned to restate its historical financial statements, that Ernst & Young was withdrawing its audit opinions and that the public should no longer rely on the prior financial statements going back as far as 2000. (GX 51).  The release further stated that the primary reason for the restatement was concern over Friedman's accounting for its allowance for doubtful accounts.  (GX 51).  Given that the defendant and his co-conspirators deliberately falsified Friedman's allowance for doubtful accounts and made other material misstatements in Friedman's financial reports, the Court should find that Friedman's disclosure of its intent to restate, i.e., that its historical financial statements were inaccurate, disclosed information that had been concealed from the market as a result of the fraud.

The Court should conclude that any loss attributable to the other negative information contained in the releases was also directly and proximately caused by the conspiracy to defraud underlying the counts of conviction.  Specifically, the November 11 release announced the Friedman's had placed Suglia on a leave of absence.  (GX 50).  As set forth in the attached affidavit of Robert Cruickshank, the primary reason that Suglia was placed on a leave of absence was that the Audit Committee had lost confidence in Friedman's financial statements (which had been falsified as part of the securities fraud scheme) and as a result lost confidence in Suglia as Chief Financial Officer.  (GA 68 (Tab 14)).  The November 11 release also announced that the government and the SEC had expanded their investigations to include a review of Friedman's allowance for doubtful accounts and other financial matters.  (GX 50).  Under Lentell's materialization of risk approach, the Court should conclude that both of these disclosures are attributable to the fraud because they both pertain to foreseeable risks of

29

engaging in a securities fraud conspiracy, namely, that the unraveling of the scheme would lead to the dismissal of the perpetrators and a government and SEC investigation.  Accord United States v. Ferguson, 2008 WL 4763238, *5-7 (D. Conn. Oct. 31, 2008) (holding that the drop in stock price following press releases announcing an SEC and New York Attorney General's investigation and the replacement of the company's CEO was attributable to the fraud under loss causation principles).  Accordingly, the Court should conclude that each of the negative items disclosed in the November 11 and November 17 press releases was a foreseeable consequence of the defendant's participation in the scheme to defraud underlying the counts of conviction.

Given the immediacy of the market's reaction to these releases, the Court should also conclude that the entire drop in stock price immediately following the issuance of these releases was proximately caused by the fraud.  As referenced above, on the first day of trading following the issuance of the November 11 release, Friedman's stock price lost 39% of its value, dropping from the November 11 closing price of $12.00 per share to $7.30 per share.  (GX 903). In addition to the severe decline in stock price, there was a substantial increase in the number of shares traded following the issuance of this release.  Whereas the total number of shares traded during the entire month preceding this release (October 13-November 11) was below 700,000, Friedman's share volume on November 12, 2003 alone was 2,238,158.  (GX 903).  Comparing the stock volume on the day following the November 11 release to the same date in the 2001 and 2002 further evidences that the decline in stock price was proximately caused by the disclosure of negative information relating to the fraud.  (See GX 903 (share volume on November 12, 2001 and November 12, 2002 was 10,491 and 47,608, respectively).

Jeffrey Stein's testimony at trial also provides further evidence that this stock decline on November 12 resulted from disclosures relating to the fraud.  After reading this release, Mr. Stein downgraded his rating of Friedman's stock from "hold" to "sell" on November 12, 2003.  (Stein 3215; GX 220).  Mr. Stein described his reaction to this release as follows:

> Well, my heart sunk, quite frankly.  My first reaction, quite frankly, was for my customers and I said, you know, my credibility is on the line.  I missed something, I've been wrong.
>
> My second reaction was one of anger and feeling that I had been deceived, that clearly there was a breakdown in the model or there had been something that had been covered up.  That was my reaction.

(Stein 3210-11) (emphasis added).

The market reacted similarly following the issuance of the November 17 release. Friedman's stock price dropped sharply from $7.38 per share to $6.06 per share on November 18, 2003, with 1,113,017 shares traded.  (GX 903).  Mr. Stein also reaffirmed his sell rating to his clients on November 18, opining that the newly announced negative news "will make it difficult for investors to assess the financial condition of the Company."  (GX 222).

While Friedman's stock lost over 50% of its value during the price drops on November 12 and November 18, 2003, the stock prices of Friedman's competitors held relatively steady.  See Rutkoske, 506 F.3d at 179-80 ("a coincidentally precipitous decline in shares of comparable companies would merit consideration.").  The following chart sets forth the stock closing prices for comparable jewelry companies during the time period at issue.

| Company | Closing Price 11/11/03 | Closing Price 11/12/03 | Closing Price 11/17/03 | Closing Price 11/18/03 |
|---|---|---|---|---|
| Zale Corporation | $27.57 | $28.03 | $27.30 | $26.50 |

| Signet Group | $36.83 | $37.11 | $37.00 | $37.33 |
| Finlay Enterprises | $16.25 | $16.38 | $15.96 | $15.58 |
| Whitehall Jewelers | $13.10 | $12.99 | $11.65 | $11.00 |

(GA 69-100 (Tabs 15-18)).[4]  Thus, the absence of similar declines in the share values of other

jewelry companies provides further evidence that Friedman's entire stock decline during the

period in question was directly and proximately caused by the securities fraud scheme.

Accordingly, pursuant to <u>Rutkoske</u>, given the immediacy of the market's reaction

to the negative disclosures stemming from the revelation of the scheme to defraud, the Court

should conclude that the difference between the pre- and post-disclosure share prices is a

reasonable measure of loss.  As indicated in the PSR, while the drop in share price on November

12 was $4.70 and the drop on November 18 was $1.32 totaling $6.02 per share, the government

has proposed using $5.94 per share as the measure of loss, which is the difference between the

closing price of Friedman's Class A common stock on November 11 and November 18, 2003.

At that time, Friedman's had over 20 million shares outstanding, excluding shares held by

---

[4]  The four companies in the chart were the "comparable" jewelry companies that
Friedman's Compensation Committee used in setting executive compensation.  (<u>See</u> GA 109
(Tab 21)).  The S&P 500 as a whole also remained stable between November 11 and November
18, 2003.  (<u>See</u> GA 104 (Tab 20) (closing at 1046.57, 1058.56, 1043.63 and 1034.15 on
November 11, 12, 17 and 18, 2003, respectively)).

members of the conspiracy.[5]  The government thus calculated the total shareholder loss to exceed $100 million.

Like the loss calculation affirmed in Ebbers, this loss amount is almost certainly too low because it does not take into account the portion of the overall decline in stock price attributable to the fraud that occurred between November 18 and the company's filing for bankruptcy in January 2005.  During that time frame, Friedman's made additional negative disclosures that were proximately caused by the securities fraud conspiracy.  These disclosures included the defendant's resignation from the company, (GX 52; see GX 903 (stock price dropped $0.64 on 12/3/03, the day following this release); Suglia's resignation from the company, (GA 6); Friedman's breach of its lending covenants by failing to file its Form 10-K, (GA 18); and the repeated disclosures concerning delays in filing Friedman's 2003 Form 10-K and restated historical financials, (GA 15-19, 22-23).  In fact, the New York Stock Exchange cited Friedman's failure to file its 2003 Form 10-K as one of the reasons that it halted trading and delisted the company in May 2003.  (GA 43, 44).  While the government is not suggesting that the negative disclosures relating to the scheme to defraud were the only reason that the Friedman's stock declined from $6.06 per share to $2.10 per share between November 18, 2003, and May 11, 2004, they were certainly responsible for a portion of this decline.  The same can be

---

[5]  The government arrived at this calculation using the information on share float contained in Friedman's September 2003 Prospectus.  (GX 2).  According to the prospectus, Friedman's had 20,754,559 shares outstanding after the offering, not including outstanding options.  (GX 2, at S-3).  From the total float, the government subtracted the shares (excluding options) held by the defendant and his family (302,219 shares), Brinkley (345,123 shares), Suglia (34,450 shares), Anderson (23,772) and Mauro (0 shares).  (GX 2, at S-31 to 32).  After making this reduction, the total amount of Class A shares held by non-conspirators was 20,294,436.  The government did not include the Class B shares, which were owned by Philip Cohen and not publicly-traded, in the loss calculation.

said of Friedman's failure to file its 2003 Form 10-K and restated financial statements between May 2004 and January 2005.

(2)     The Court Should Reject the Defendant's
Objections to the Government's Loss Calculation

The defendant has not set forth an alternative method for calculating loss to shareholders nor argued that the Court should use one of the other loss calculation methods contained in the Guidelines, such as the conspirators' gain.  Rather, the defendant has only argued that the government's loss calculation is flawed and that the Court should therefore not impose a loss enhancement.  All five of the defendant's claims pertain to the proof with respect to loss causation, which, as discussed above, requires only a showing that the losses incurred were proximately caused by the fraud.  Rutkoske, 506 F.3d at 179;  Lentell, 396 F.3d at 172-73.[6]

The defendant first claims that the evidence did not establish that Friedman's share price was inflated as a result of the defendant's false statements.  In making this argument, however, the defendant completely ignores perhaps the best evidence that Friedman's price was inflated as a result of the fraud: the fact that Friedman's stock dropped immediately and precipitously upon disclosure of some (but not all) of the information concealed by the fraud. The market's severe reaction to this information as evidenced by the steep increases in share volume and steep decreases in share price, standing alone, is sufficient to prove that Friedman's

---

[6]  In this response, the government addresses only the substantive arguments raised in the defendant's sentencing submissions.  Throughout this case, however, the defendant has made numerous baseless and unsubstantiated allegations against the government.  In many regards, the defendant's sentencing submissions are no different.  To the extent that the defendant has included anti-government rhetoric in his sentencing submission, the government has elected not to respond and further burden the Court with matters clearly irrelevant to the defendant's sentencing.

share price was inflated as a result of the fraud.  See Lentell, 396 F.3d at 176-77 (stating that to successfully plead loss causation, a plaintiff need only allege that misstatements or omissions concealed risks that materialized and played some part in diminishing the market value of the stock).

Moreover, the government presented additional evidence at trial concerning inflation of the share price.  This evidence included proof that the defendant's misrepresentations caused investors to buy or hold Friedman's stock.  For example, Mr. Stein testified that he relied on the defendant's false statements and the false statements in Friedman's public filings in recommending Friedman's stock to his clients.  (Stein 3149-53, 3206-07).  Mr. Stein testified that his incorrect belief that Friedman's had a strict, 120-day charge off policy was an important factor in his decision to recommend Friedman's stock to his clients.  (Stein 3168).  Mr. Stein testified that the failure to follow that policy would result in an overstatement of earnings and would completely undermine the reliability of Friedman's reported financial performance, which would make it "extremely difficult to make earnings projections which investors were relying on to make an informed investment decision."  (Stein 3169-70).  Michael Nesbitt, a Friedman's investor, also testified that he relied on the company's false statements in its public filings in making his investment decisions, including the defendant's misrepresentation that Friedman's charged off in 120 days.  (Nesbitt 2228-30, 2302).

As further proof that the fraud inflated Friedman's share price, the evidence established that Friedman's earnings were overstated by millions of dollars during the conspiracy through scooping, accounting for the x-files and manipulation of the allowance for doubtful accounts.  For example, the defendant and his coconspirators scooped almost $14 million in

Friedman's 2002 fiscal year and scooped an average of $3 million per month in 2003. (Suglia 1045-46, 2171-78, GX 847-858, 602). Friedman's pre-tax income was also overstated in 2001 and 2002 by virtue of the defendant's policy of requiring that Friedman's report a year-end allowance for doubtful accounts of 10% of total accounts receivable. (Suglia 1356-58; GX 532, 536). To be sure, the November 11 and 17 press releases disclosed that Friedman's earnings per share would decrease by more than $0.43 (over $9 million in total income) based on the difference between Friedman's then-expected year-end allowance under the best case scenario and the July 2003 pre-announced allowance which the defendant published to the market in furtherance of the scheme to defraud. (GX 50, 51). Accordingly, the Court should find that the evidence established that Friedman's share price was inflated as a result of the scheme to defraud.

The defendant's next claim is that the government's loss calculation results in an inflated loss amount because it does not exclude shareholders who purchased shares prior to the start of the charged conspiracy. This argument is precluded by the Second Circuit's decision in Ebbers, which made clear that shareholders who purchase prior to the start of the charged conspiracy but hold until after disclosure of the fraud suffer a "loss" under the Guidelines. 458 F.3d at 127. The court stated:

> The securities laws are intended to allow investors to buy, sell, or hold based on accurate information. An investor who buys securities before an extended fraud begins, and holds them during the period of the fraud, may therefore be little different from one who buys mid-fraud.
>
> For example, the ongoing fraud here involved a series of periodic, fraudulent financial reports that systematically inflated [the company's] operating profits. If the first report had been accurate, some decrease in fundamental value would have been revealed, but

> the decrease would have been far less than that revealed . . . after
> several more fraudulent reports.  Investors who held their stock
> throughout the fraud period were therefore denied the opportunity
> to reassess and perhaps sell according to their informed estimates
> of the declining performance.

Id. (emphasis added).  Accordingly, the Court should reject the defendant's argument that

shareholders who purchased prior to the start of the conspiracy, such as Mr. Nesbitt and Mr.

Cruickshank, should be excluded from the loss calculation.  Id.  ("some estimate [of the loss to

investors who hold during the period of an ongoing fraud] must be made for Guidelines'

purposes, otherwise perpetrators of fraud would get a windfall.").

      The defendant's third claim is that the government's loss calculation is inaccurate

because there was no proof of a corrective disclosure.  In making this argument, the defendant

contends that the November 11 and 17 press releases do not constitute corrective disclosures

because they did not contain the "correct," final numbers.  The Court should reject the

defendant's argument because it overstates the proof requirements for loss causation in civil

securities fraud actions.

      In the leading Supreme Court case, Dura Pharmaceuticals v. Broudo, 544 U.S.

336 (2005), the Court held that a securities fraud plaintiff cannot satisfy the loss causation

element of a securities fraud claim by alleging only that he purchased shares at an inflated

purchase price.  Id. at 342-46.  Accord Lentell, 396 F.3d at 174 ("It is not enough to allege that a

defendant's misrepresentations and omissions induced a "purchase-time value disparity"

between the price paid for a security and its "true 'investment quality.'") (citation omitted).  The

Court, however, did not provide any guidance as to what facts a plaintiff must allege to state a

claim for loss causation.  See In re Public Offering Securities Litigation, 399 F. Supp. 2d 261,

265 n.23 ("Dura itself does not define a pleading standard for loss causation; it simply rejects the Ninth Circuit's standard as overly permissive.").

As discussed above, the Second Circuit articulated this standard in Lentell. The court stated that, to prove loss causation, a plaintiff need only establish that "the misstatement concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell, 396 F.3d at 173. While this burden may be satisfied by showing that the "correct," final information was disclosed to market, it also may be satisfied by showing that "the ultimate decline in the companies' stock price was attributable to the very thing that the defendant allegedly lied about." Fogarazzo v. Lehman Bros., Inc., 341 F. Supp. 2d 274, 289 (S.D.N.Y. 2004); see also In re Omnicom Group, Inc. Securities Litigation, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008) ("Loss causation may be established either where (1) the market reacted negatively to a corrective disclosure or (2) the materialization of the risks that were concealed by the alleged misrepresentations or omissions proximately caused plaintiff's loss.").[7]

The negative financial disclosures in the two press releases easily meet this standard. The press releases disclosed negative information about Friedman's allowance for doubtful accounts and historical financials, and the evidence proved that these were the subject of the defendant's lies in furtherance of the conspiracy. That the company was unable to easily unravel the scheme in order to restate or determine the exact allowance percentage in November

---

[7] In fact, the defendant misquotes Lentell at page 37 of his sentencing memorandum. While the defendant claims that Lentell stated that the absence of a corrective disclosure is fatal under Second Circuit precedent, Lentell actually stated the following: "There is no allegation that the market reacted negatively to a corrective disclosure . . . and no allegation that [the company] misstated or omitted risks that did lead to the loss. This is fatal under Second Circuit precedent." 396 F.3d at 175 (emphasis added).

2003 is a testament to the extent and sophistication of the securities fraud scheme; it certainly should not inure to the defendant's benefit in determining his Guidelines range or the amount of restitution owed to his victims.  Accordingly, the Court should reject the defendant's claim that the negative information did not proximately cause any loss to the market because the press releases did not announce final correct numbers.  Accord Ferguson, 2008 WL 4763238, *4-7 (rejecting the argument that press releases that did not "correct[] anything" could not satisfy the loss causation standard).

The defendant also argues that the November announcement concerning the increases in the allowance did not proximately cause the shareholders' losses because the July 2003 pre-announcement was accompanied by cautionary language.  The Court should reject this argument because, as discussed above, the evidence established that the defendant knew that his and Suglia's statements in the July 2003 press release and on the corresponding analyst call concerning the pre-announcement were false at the time they were made.  See United States Securities & Exchange Commission v. Meltzer, 440 F. Supp 2d 170, 191 (E.D.N.Y. 2006) (stating that the presence of cautionary language accompanying a misstatement will not shield a defendant from liability "'where a defendant knew that its statement was false when made.'") (quoting Gabriel Capital, L.P. v. NatWest Fin. Inc., 122 F. Supp. 2d 407, 419 (S.D.N.Y. 2000)). Having made the decision to falsely pre-announce for the purpose of coercing Ernst & Young to approve a year-end allowance he knew to be too low, the defendant should not now be allowed to rely on cautionary boilerplate to disclaim responsibility for the drop in stock price when the market learned the truth.

39

The Court should also reject the defendant's assertion that the November press releases contained negative information unrelated to the securities fraud scheme, specifically, disclosures relating to the Capital Factors fraud.  Contrary to the defendant's assertion, the SEC and government investigations into the Capital Factors matter were previously disclosed to the market in several press releases and Form 8-Ks filed in September and October 2003.  These disclosures advised the market that: (1) the SEC had opened an investigation into the allegations contained in the Capital Factors lawsuit (GX 47 (September 12, 2003 Form 8-K)); (2) the Department of Justice opened an investigation into the allegations in the Capital Factors lawsuit (GX 48 (October 2, 2003 Form 8-K)); and (3) the filing of Friedman's Form 10-K would be delayed due to the diversion of company resources to fulfill information requests in connection with these lawsuits (GX 49 (October 23, 2003 press release and October 24, 2003 Form 8-K)).

Conversely, the November press releases contained no new disclosures about the Capital Factors investigations.  In fact, the November 17 press release did not even mention Capital Factors.  (GX 51).  Similarly, the November 11 press release only mentioned Capital Factors in passing in advising the market that the SEC formalized its previously disclosed inquiry and that the previously disclosed SEC and Department of Justice Capital Factors-related investigations had been expanded to include an investigation into Friedman's allowance for doubtful accounts and other financial matters, the very subjects of the defendant's lies underlying the charged offenses.  (GX 50).  Thus, the defendant's assertion that the November press releases contained negative disclosures concerning the Capital Factors fraud is belied by the evidence.  In addition, as noted above, even the placing of Suglia on a leave of absence had nothing to do with the Capital Factors fraud; rather, it stemmed from Friedman's independent

directors starting to uncover problems with Friedman's financial statements; problems that the defendant and his co-conspirators covered up pursuant to the securities fraud scheme underlying the counts of conviction.  And perhaps more significantly, Suglia's leave of absence was announced in a press release that pertained exclusively to facts covered up by the securities fraud scheme.  See Omnicom, 541 F. Supp. 2d at 553 (suggesting that a director's resignation accompanied by a disclosure relating to an investigation into accounting issues constitutes a corrective disclosure).

The Court should therefore conclude that all of the negative disclosures contained in the November releases satisfy the Lentell standard for loss causation.  These disclosures revealed to the market a portion of the truth that the defendant's and his co-conspirators covered up as a result of the fraud and other foreseeable risks that were proximately caused by the defendant and his co-conspirators.  Nothing more is required under the Lentell standard.

The defendants' fourth claim is that there was no proof that shareholders suffered a realized loss, i.e., one in which the ultimate sale price was below the price at which the stock was purchased.  As discussed below, however, the defendant's assertion is factually incorrect given the September 2003 offering in which Friedman's issued approximately 3.8 million new shares into the market at a price of $15.00 per share.  The defendant's assertion is also legally incorrect because the Second Circuit has rejected the realized loss requirement.

The Supreme Court in Dura expressly reserved decision on the issue of whether a plaintiff who sells his shares after disclosure of the fraud at a price higher than the price at the time of purchase suffers a cognizable loss under the securities laws.  In opining that the difference between a plaintiff's purchase price (even if inflated due to the fraud) and sale price

41

does not necessarily measure the amount of loss caused by the fraud, the court discussed two examples.  In the first, the shareholder purchased at an inflated price but sold before the relevant truth was disclosed to the market.  Id. at 342.  The Court stated that the shareholder in that example does not have a cognizable securities fraud claim because the fraud did not lead to any loss.  Id.  In the second example, the shareholder purchased at an inflated price and resold at a lower price after disclosure of the fraud.  Id. at 342-43.  The Court opined that the shareholder may have suffered a cognizable loss provided that some of the dissipation in stock price was due to a price inflation that resulted from the fraud, as opposed to other factors unrelated to the fraud.  Id.  The Court also observed that unrelated factors can act push a shareholder's sale price above his purchase price, but declined to decide whether such a shareholder had a cognizable securities fraud claim.  Id. at 343 ("The same is true [i.e., unrelated factors may impact share price] in respect to a claim that a share's higher price is lower than it would otherwise have been – a claim we do not consider here.").[8]

Under Second Circuit precedent, however, loss causation is not limited to only realized losses.  The focus of the Lentell loss causation standard is the amount of the diminishment of market value of the stock that was caused by the fraud.  396 F.3d at 161.  This standard permits a recovery where the disclosure of the fraud "negatively affected the value of the security."  Id. at 173.  In addition, the Ebbers court made explicitly clear that there is no loss

---

[8]  Contrary to the defendant's assertion, the Supreme Court did not address this question in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975).  That case held only that plaintiffs who neither purchased or sold securities may not maintain a private cause of action under section 10(b) of the Securities Exchange Act of 1934.  Id. at 725-49.  Because the government has excluded the holders of options from the loss calculation, Blue Chip Stamps has no relevance to the present case.

realization requirement in holding that investors who buy pre-fraud and hold until after disclosure suffer a "loss" for Sentencing Guidelines purposes.  458 F.3d at 127.  The Court should therefore reject the defendant's assertion that the loss for which he is responsible is limited to realized losses.

Moreover, the defendant's Guidelines range would not change even if this Court adopts the methodology approved in the cases cited by the defendant.  In raising his realized losses claim, the defendant cited to the Fifth Circuit's decision in United States v. Olis, 429 F.3d 540 (5th Cir. 2005).  The actual holding in Olis was that the district court's loss calculation was flawed because it did not take into account extrinsic factors that adversely impacted the company's stock price.  Id. at 548-49.  Olis's holding therefore does not pertain to the defendant's realized loss argument and is inapposite to the facts of this case because, for the reasons set forth above, the Court should conclude that the loss following the November press releases was attributable to the fraud.

As the defendant points out, however, there is language in Olis which is critical of the method proposed by the government here, as well as a similar method approved by the Second Circuit in United States v. Eyman, 313 F.3d 741 (2d Cir. 2002), and United States v. Moskowitz, 215 F.3d 265 (2d Cir. 2000).  Olis, 429 F.3d at 546-47 (rejecting the "market capitalization" approach used in these Second Circuit cases as "unenlightening.").  The Fifth Circuit instead expressed agreement with the methodology used in United States v. Snyder, 291 F.3d 1291 (11th Cir. 2002) and United States v. Bakhit, 218 F. Supp. 2d 1232 (C.D. Cal. 2002).

Notably, in Snyder, the Eleventh Circuit expressly rejected the loss position that the defendant advocates in the present case, namely, that the Court should conclude that there

was no loss.  291 F.3d at 1295-96 (reversing and remanding for resentencing because "the trial court erred when it found calculating the loss to victims was not feasible."); see also Olis, 429 F.3d at 547 (noting that both Snyder and Bakhit "rejected defendants' arguments that attempted to reason away all losses caused by the fraud.").   The court instead instructed the trial court to calculate the per share loss amount by subtracting the average price during the three day time period following the disclosure of the fraud from the average stock price during the time period between the last fraudulent press release and the disclosure of the fraud to the market.  Id. at 1296 and n.6.  The court further instructed that the total loss was equal to the average number of shares traded during that time period multiplied by the per share loss amount.  Id.  Bakhit adopted Snyder's methodology and calculated the per share loss amount as the average price during the life of the fraud less the average selling price after the fraud, that is, during the time period between the disclosure press release and the company's next press release announcing genuine earnings numbers.  218 F. Supp. 2d at 1240-42.  Because the fraud dated from the time of the initial offering of stock, Bakhit applied this loss amount to all of the outstanding shares.  Id. at 1242.

This Court should reject the Snyder/Bakhit methodology for several reasons.  First, this methodology improperly excludes from the loss calculation all shareholders who bought pre-fraud and held until after disclosure.  See Ebbers, 458 F.3d at 127.  Under Snyder, all shareholders who bought prior to the fraudulent press release were excluded from the loss calculation.  This position is directly at odds with Ebbers' holding that investors who hold their shares during the entirety of an ongoing fraud suffer a loss that must be estimated by the sentencing judge.  Id. 127.  Second, this methodology does not take into account the cumulative

44

effect of multiple fraudulent disclosures.  Snyder and Bakhit involved frauds of relatively short duration and both cases reference only the issuance a single fraudulent document.  See Snyder, 291 F.3d at 1296 (fraudulent press release issued 16 days prior to disclosure of the fraud); Bakhit, 291 F. Supp. 2d at 1235 (fraudulent registration statement pertaining to initial public offering of shares issued six months prior to disclosure of the fraud).  Conversely, Ebbers made clear that where, as here, there are a series of periodic, fraudulent financial reports, the district court must take into account the cumulative impact of the fraudulent disclosures.  458 F.3d at 127.  Third, despite Olis's endorsement of the Snyder/Bakhit approach, this methodology is less likely than the government's proposed methodology to remove the impact of extrinsic factors from the loss calculation.  For example, as applied to this case, the Snyder/Bakhit approach would not sufficiently discount the pre-fraud average price to reflect that prior to the Capital Factors-related disclosures in September and October 2003, Friedman's stock price was also inflated for reasons unrelated to the charged conspiracy.

        In any event, even under the flawed Snyder/Bakhit approach, the defendant's Guidelines range would not change from that calculated by the Probation Department.  In the September 2003 offering, which was supported by a fraudulent prospectus filed with the SEC and mailed to shareholders, Friedman's sold 3,770,280 shares to the market at a price of $15 per share.  (Ellis 3532-33; GX 2, 3500-JE-2).  With an average post-fraud sale price of $6.30 per share (average price between November 18, 2003 and Friedman's January 7, 2004 sales release) and an average pre-disclosure price of $12.65 per share (average price between September 22, 2003, the first day of trading after the offering, and November 11, 2003), the holders of the September 2003 shares would be presumed to have incurred a loss of $6.35 per share, and a total

45

loss of $23,932,617, pursuant to <u>Snyder/Bakhit</u>.  (GA 101-02 (Tab 19)).[9]  The approximately $24 million dollars in losses for the holders of a just a fraction of Friedman's outstanding shares (less than 20%) would result in a 22-level loss enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(L), a total offense level of 44 and a Guidelines range of life.[10]  Accordingly, even if the Court were to accept the defendant's realized loss argument, the applicable Guidelines range would be the same.

The defendant's final claim is that the government has not proved loss causation, which is the same issue as that disputed in his first four claims.  The arguments in this claim are mostly redundant to the arguments raised in connection with his other claims.  The only new argument that the defendant raises is the limitation of damages provision contained in the Private Securities Litigation Reform Act ("PSLRA"), which, in essence, directs courts in civil securities fraud claims to use the higher of the stock price following the disclosure of the fraud or the mean trading price during the 90-day period following the fraud in calculating damages.  Securities Exchange Act §21D(e), codified as 15 U.S.C. § 78u-4(e).  Application of this provision,

---

[9]  Even removing the overvaluation relating to Capital Factors yields a loss of more than $20 million for these shareholders under this methodology.  The average price during the time period between the last Capital Factors disclosure (October 24, 2003) and November 11, 2003 was $11.98.  (GA 101 (Tab 19)).  Under this calculation, the holders of the September 2003 offering shares would have a per share loss amount of $5.68 ($11.98-$6.30) and a total loss of $21,429,691.  (GA 101-02 (Tab 19)).

[10]  Given that the government disputes the accuracy of this methodology, it has not calculated the loss incurred by the holders of the approximately 17.5 million shares outstanding prior to the September 2003 offering.  The calculation of loss for these shareholders would require a determination of the average share volume and average purchase price (1) between the last fraudulent earnings  release in July 2003 and November 11, 2003; and (2) between each of the fraudulent earnings releases issued during the course of the scheme.  The government will submit such a calculation at the Court's request.

however, would not impact the Guidelines calculation in this case.  During the 90-day period

following the November 17 release, Friedman's mean trading price was $6.72 a share.  (GA 103

(Tab 19)).  As a result, the per share loss amount under the PSLRA formula is $5.28 ($12.00 -

$6.72), and the total loss still exceeds $100 million.

* * * *

In sum, the Court should impose a 26-level loss enhancement based on a loss

amount exceeding $100 million.  Should the Court disagree with the government's loss

calculation, the approach suggested by the defendant would result in the same Guidelines range

based on a 22-level loss enhancement for losses exceeding $20 million.  In fact, given that there

were more than 20 million shares outstanding, the defendant's Guidelines range would remain

the same so long as the Court concludes by a preponderance of the evidence that at least $1

dollar (approximately 1/6) of the 50% decline in the Friedman's stock price following the

November press releases was attributable to the securities fraud conspiracy.  Even if the Court

does not accept all of the government's arguments, the evidence at trial and submitted in

connection with this motion easily support such a determination under any methodology.

b.    Compensation Losses

The evidence at trial established that the defendant and his co-conspirators

illicitly obtained $861,000 in bonuses at the end of Friedman's 2002 fiscal year and $696,000 in

unauthorized tax payments as a result of the fraud.  (Suglia 1396-1400, 1441-43; Cruickshank

1957-59, 1963-64; Mauro 2413-17, 2680-81; GX 252, 515, 778).  Contrary to the defendant's

assertion, the evidence established that this compensation was directly attributable to the fraud

because the defendant and his co-conspirators would have received none of this compensation

had they not committed securities fraud.  (See, e.g., Suglia 1396-1400; Cruickshank 1963-64; GX 778).

If anything, the government's loss calculation understates the amount of money that the defendant stole from the company.  The loss calculation does not include the portion of the defendant's 2003 salary increase and other compensation, including restricted stock, that he obtained though lying to the Compensation Committee about Friedman's true financial performance.  (See Cruickshank 1960-61 (testifying that the decision to the raise the defendant's salary by more than 50% was based on the Committee's misperception that "the company was doing very well")).  This calculation also does not include the $438,700 in bonuses that the defendant and his co-conspirators attempted to steal from the company at the end of the 2003 fiscal year before being thwarted by the start of the government's investigation. (Suglia 1549-53; GX 31, 872, 873).

    c.    Friedman's Reasonably Foreseeable Expenses

Pursuant to Lentell, the defendant is responsible for the reasonably foreseeable consequences of engaging in the scheme to defraud.  Applying the proximate cause standard, the Southern District of New York held that a defendant who participates in a securities fraud scheme is responsible for any reasonably foreseeable expenses incurred by the company upon discovery of the scheme, including the costs of restatement.  United States v. Cummings, 189 F. Supp. 2d 67, 76-79 (S.D.N.Y. 2002).  Under this standard, the Court should find that the defendant is responsible for expenses that Friedman's incurred in conducting an internal investigation into the securities fraud conspiracy and in attempting to restate its financials.

    2.    The Court Should Find that There Were More than 250 Victims

Under U.S.S.G. § 2B1.1(b)(2), sentencing courts are directed to increase a defendant's offense level based on the number of victims.  This guideline provides a six-level enhancement for offenses involving more than 250 victims.  U.S.S.G. § 2B1.1(b)(2)(C).  A "victim" is defined as any person, including individuals, corporations and partnerships, "who sustained any part of the actual loss" determined under U.S.S.G. § 2B1.1(b)(1) cmt. n.1.

To date, the government has identified more than 700 individuals and entities who held Friedman's stock either in their own accounts or through an account at a brokerage firm at the time of the November press releases.  See Ferguson, 2008 WL 4763328, *8 (finding that individual shareholders who held through mutual funds were each "victims" under the Guidelines).  Accordingly, under any loss calculation, the Court should conclude that each of these individuals and entities is a victim pursuant to U.S.S.G. § 2B1.1(b)(2) and should therefore impose a six-level enhancement based on the number of victims.

3.      The Court Should Impose a Four-Level Officer and Director Enhancement

Under U.S.S.G. § 2B1.1(b)(14), sentencing courts are directed to impose a four-level increase where the offense involved a violation of the securities laws and the defendant was an officer or director of a publicly traded company.  The defendant does not dispute that the offense involved a violation of the securities laws and that he was a officer and director of Friedman's, a publicly-traded company.

The defendant nevertheless asserts that the Court should not impose this enhancement, arguing that Judge Block suggested in United States v. Parris, 573 F. Supp. 2d 744 (E.D.N.Y.  2008), that this enhancement, even when applicable, need not always be imposed.  Contrary to the defendant's assertion, Judge Block at no point indicated that he was not properly

calculating the defendants' Guidelines range, see id. at 749 (imposing a four-level

officer/director enhancement), 751 ("I began the sentencing proceeding "'by correcting

calculating the applicable Guidelines range'") (citing Gall, 128 S.Ct. at 596), which in any event

is required under Supreme Court precedent. Gall, 128 S.Ct. at 596.  Accordingly, the Court

should impose the four-level officer/director enhancement in this case.

       4.     The Court Should Impose a Four-Level Aggravating Role Enhancement

       The Guidelines direct courts to increase a defendant's offense level by four levels

if the defendant was an "organizer" or "leader" of criminal activity involving five or more

participants or that was otherwise extensive.  U.S.S.G. § 3B1.1(a); see United States v. Patasnik,

89F.3d 63, 68-69 (2d Cir. 1996) (noting that a district court must make specific factual findings

for an aggravating role enhancement to apply).  The Guidelines instruct the Court to evaluate the

following factors in determining whether a defendant is a "leader" or "organizer":  "the exercise

of decision making authority, the nature of participation in the commission of the offense, the

recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the

degree of participation in planning or organizing the offense, the nature and scope of illegal

activity, and the degree of control and authority over others."  Id. cmt. n.4.  For conspiracies like

the present one involving a business's highest officer, the Second Circuit has affirmed the use of

a leadership enhancement even where the officer was merely aware of the scheme.  United States

v. Duncan, 42 F.3d 97, 105-06 (2d Cir. 1994).  The evidence in this case much more strongly

supports a leadership enhancement than that in Duncan, given that the evidence showed that the

defendant directed and controlled the entire scheme, personally selected the false numbers that

Friedman's reported to the market and profited more than any of his co-conspirators.

Both cooperators testified that the defendant organized and led the securities fraud scheme.  For example, Suglia testified that the defendant made the final decision about the net income and earnings-per-share numbers that Friedman's would report in its financial statements, which was usually higher than actual results and typically as close to the consensus estimate as the defendant and Suglia "felt they could get away with." (Suglia 1008).  Suglia further testified that the defendant had the final say in closing Friedman's internal books every month. (Suglia 1014).  Suglia also testified that the defendant made the final decision concerning Friedman's allowance for doubtful accounts percentage, the x-files and the tax expense manipulation.  As to the allowance, Suglia testified, inter alia, that the defendant pre-determined Friedman's year-end allowance, (see, e.g., Suglia 1095-97), that the defendant did not allow Suglia to raise the 2002 year-end percentage above 10%, (Suglia 1231-33, 1351), and that the defendant pre-determined that Friedman's would report a year end allowance percentage for 2003 at 10.5%, (Suglia 1457).  As to the x-files, Suglia testified that the defendant made the final decision as to how to handle x-files in third quarter 2002 and did not follow all of Suglia's recommendations. (Suglia 1263-66, 1280-81).  Suglia also testified that the defendant was involved in deciding how much of the x-files to charge off at the end of 2002 fiscal year and oversaw Suglia's work to make sure it was done properly. (Suglia 1334-36).  Suglia further stated that the defendant came up with the idea for the tax expense manipulation and directed Suglia to implement it. (Suglia 1441-42).

Similarly, Mauro testified that the defendant and Suglia were not equals and that "[i]t was clear to [him] that Brad Stinn called the shots." (Mauro 2315).  Mauro also testified that he felt "extreme pressure" from the defendant to hit Friedman's earnings targets. (Mauro

51

2338).  Mauro further explained that the defendant (not Suglia) had the final approval as to

Friedman's annual report, (Mauro 2692), and exercised decision-making authority with respect

to a number of the more significant manipulations including the allowance for doubtful accounts

and the x-files.  Mauro testified that Suglia told him during the course of the conspiracy that the

defendant would not allow Suglia to increase the allowance above 10% and that Suglia would

lose his job if had try to book the allowance at a higher rate.  (Mauro 2362-63).  Mauro testified

that Suglia had "no real control" over the allowance that was booked because "[u]ltimately it

was not his decision. . . . It was Brad's decision."  (Mauro 2398-99).  Mauro also testified that

the defendant had the final say about not disclosing the x-files to Ernst & Young or the public.

(Mauro 2383-84).

         The cooperators' testimony about the defendant's leadership position in the

conspiracy was corroborated by numerous documents in which Suglia asked the defendant's

permission or made recommendations to him relating to financial decisions.  For example, Suglia

sent an email to the defendant in March 2002 requesting permission to raise the allowance above

10% at the end of the 2002 fiscal year "if we have the room and opportunity," i.e., if the increase

would not prevent Friedman's from hitting its earnings targets.  (Suglia 1231-32; Mauro 2367-

68; GX 875).  Suglia and Milligan also sent a series of memoranda and emails to the defendant

making recommendations and seeking advice concerning accounting for the x-files.  (See, e.g.,

GX 527, 528, 572, 751, 825).  Suglia also sent an e-mail to the defendant and Douglas Anderson

recommending that Friedman's scoop for an additional week in order to hit the charge off plan.

(GX 507).

Moreover, the nature of the relationship between the defendant and Suglia was apparent to individuals with no knowledge about the conspiracy.  Jeffrey Stein described the relationship as follows: "Mr. Stinn was – definitely had kind of the upper hand.  It was – he was kind of the leader."  (Stein 3158).  Similarly, Robert Cruickshank testified that the defendant's and Suglia's relationship was not a relationship of equals, but that the defendant called the shots. (Cruickshank 1938 ("Brad was the CEO, and he was a strong CEO")).

The defendant also took an active role in covering up the fraud.  The defendant controlled what his underlings disclosed to non-conspirators.  (See, e.g., Suglia 1467-70; GX 662, 663).  The defendant also lied on multiple occasions to Friedman's auditor, to its Audit Committee, in Friedman's publicly-disseminated press releases, on earnings calls, and in other documents Friedman's filed with the SEC.  See, e.g, Gov. Rule 29/33 Mem. at 34-35 (enumerating some of the defendant's lies).

Additionally, the evidence established that the defendant profited from the scheme more than any of his co-conspirators.  The defendant received the largest bonus for 2002. (GX 252, 519).  The defendant received the largest salary increase for 2003.  (GX 252, 519). The defendant received the most restricted stock and the most money in tax compensation.  (GX 252, 519, 913).  Absent the government's announcement of its investigation, the defendant would have received the largest bonus for 2003.  (GX 872, 873).

Accordingly, the Court should find that the defendant was a leader and organizer. The Court should also conclude that the criminal activity involved five or more participants, (see Suglia 951-52 (identifying other conspirators), 1076-78), and that the criminal activity was "otherwise extensive."  See U.S.S.G. § 3B1.1 cmt. n.3 ("In assessing whether an organization is

'otherwise extensive,' all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the services of many outsiders could be considered extensive.").  The defendant should therefore receive a four-level aggravating role enhancement under U.S.S.G. § 3B1.1.

     5.    <u>The Court Should Impose a Two-Level Sophisticated Means Enhancement</u>

        Under U.S.S.G. § 2B1.1(b)(8), sentencing courts are directed to impose a two-level increase if the offense involved "sophisticated means.  The Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense."  <u>Id.</u> cmt. n.7(B).  This enhancement applies either when the defendant directly uses sophisticated means or when the defendant's conspirators' use of sophisticated means was known or reasonably foreseeable to him.  <u>See United States v. Miles</u>, 360 F.3d 472, 482 (5th Cir. 2004); <u>United States v. Lewis</u>, 93 F.3d 1075, 1084 (2d Cir. 1996)  (finding that the "sophisticated means" enhancement contained in U.S.S.G. § 2T1.1(b)(2) applied, stating "[a] defendant cannot escape punishment simply by contracting out to his accountants the dirty work of tax evasion.").

        In the present case, the Court should conclude that the sophisticated means enhancement applies based on the complex accounting manipulations used to achieve the fraudulent numbers mandated by the defendant.  These manipulations included scooping, covering up the x-files and the use of a supplemental migration analysis to falsify Friedman's allowance for doubtful accounts.  The evidence showed that these manipulations were necessary in order to conceal the scheme from Friedman's outside auditor, Ernst & Young.  In fact, the web of manipulations implemented over numerous quarters was so pervasive that it ultimately

proved impossible to untangle.  Thus, despite the best efforts of accounting and financial experts to right Friedman's books and restate its financial condition for the previous three years, the complexity and sophistication of the fraud rendered the task futile.

The evidence also proved that the defendant was responsible for setting all of these complex accounting manipulations in motion through his leadership in the conspiracy and his personal involvement in, inter alia, selecting Friedman's reported earnings numbers, pre-determining its reported allowance and covering up the x-files.  Thus, the sophisticated accounting manipulations used to hide the conspiracy from Ernst & Young were known or reasonably foreseeable to the defendant.

<u>POINT THREE</u>

THE DEFENDANT'S SENTENCE SHOULD INCLUDE
<u>      A LENGTHY PERIOD OF INCARCERATION      </u>

After calculating the defendant's advisory Guidelines range, the sentencing judge

must consider the seven factors listed in 18 U.S.C. § 3553(a) in determining the defendant's

sentence. <u>Gall</u>, 128 S.Ct. at 596. That section directs a court to impose a sentence that is

"sufficient, but not greater than necessary" to comply with the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for
> the law and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most
> effective manner.

18 U.S.C. § 3553(a)(2).

While the Guidelines are now advisory, the court must explain any departure from

the advisory Guidelines with a justification that is "sufficiently compelling to support the degree

of the variance." <u>Gall</u>, 128 S.Ct. at 597. Major departures must be supported by a more

significant justification than a minor departure. <u>Id.</u>

The court of appeals applies a "presumption of reasonableness" to a district

court's sentence within the advisory Guidelines range. <u>Rita</u>, 127 S.Ct. at 2462-65. To the extent

that the district court varies from the advisory Guidelines range, that variance enjoys the greatest

respect when it is based on factors "outside of the heartland" of those considered by the

Sentencing Commission in fashioning the applicable Guidelines. <u>Kimbrough</u>, 128 S.Ct. at 574-

75.  Conversely, the court of appeals more closely scrutinizes variances from the Guidelines that are based on the sentencing judge's conclusion that the Guidelines themselves fail to reflect section 3553(a) considerations.  Id. at 575 ("while the Guidelines are no longer binding, closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range 'fails to reflect § 3553(a) considerations' even in a mine-run case.") (quoting Rita, 127 S.Ct. at 2465).

Although indicating that he intends to submit further briefing on the issue, the defendant's initial sentencing memorandum suggests that he will request that the Court impose a non-Guidelines sentence on the ground that the Guidelines range proposed by the government fails to reflect section 3553(a) considerations.  The government agrees with the defendant that the life sentence called for by the Guidelines (and even the 70-year statutory maximum) is excessive in the present case, and that a non-Guidelines sentence is sufficient in this case.  The government, however, submits that the section 3553(a) factors support the imposition of a sentence including a lengthy period of incarceration for the following reasons.

First, the defendant's advisory Guidelines range advises that the Court should sentence the defendant to the statutory maximum.  As the Supreme Court has noted, the Guidelines reflect the Sentencing Commission's "rough approximation of sentences that might achieve § 3553(a)'s objectives," Rita, 127 S.Ct. at 2464-65, and "are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." Gall, 128 S.Ct. at 594.  The fact that the Sentencing Commission's rough approximation of the appropriate sentence in this case is lifetime incarceration evidences that the

Sentencing Commission views the offenses committed by the defendant as extremely serious and advises that a lengthy period of incarceration is appropriate.

Second, the Court should impose a lengthy period of incarceration based on "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In determining the appropriate sentence in United States v. Parris, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), "a rather typical 'pump and dump' scheme," the court compiled a list of nationwide sentences in securities fraud cases. Upon analysis of the sentences in that list, the court stated:

> although the sentences in the Government's compendium obviously were impacted by many variables, such as whether they were imposed before or after the passage of the Sarbanes-Oxley Act, or whether the defendant pleaded guilty or was a cooperator, it was perfectly clear that there was a correlation between the losses in those cases and the periods of incarceration: Those who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); those whose losses were less than $100 million were generally sentenced to single digit terms.

Id. at 753 (footnote omitted); see also id. at 746 (stating that the fraud in that case was "simply not of the same character and magnitude as the securities-fraud prosecutions of those who have been responsible for wreaking unimaginable losses on major corporations and, in particular, on their companies' employees and shareholders, many of whom lost their pensions and were financially ruined."). Notably, Parris was one of the cases relied by the defendant in arguing that the sentence called for by the Guidelines was excessive in this case. See Defendant's Initial Sentencing Memorandum, at 24.

Third, the offense conduct in this case was "egregious." See United States v. Adelson, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006). Through a series of lies spanning multiple

years, the defendant hid from his shareholders the serious problems that Friedman's had with the execution of its business model.  While the defendant was reaping seven-digit compensation, the defendant's lies concealed the fact that Friedman's was hemorrhaging money due to mismanagement, poor credit decisioning and unfettered expansion.  He made an unprofitable company appear to have achieved "record" earnings and income.  The defendant willfully violated his fiduciary obligations to shareholders who had entrusted hundreds of millions of dollars of assets to his care, including more than $20 million in new shareholder investments that the defendant induced through a fraudulent prospectus in 2003.  The end result of his deceit was the loss of all shareholder value.  The offense conduct thus weighs heavily in favor of a lengthy sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  See 18 U.S.C. § 3553(a)(2)(A).

Finally, the defendant's complete lack of remorse weighs in favor of a lengthy period of incarceration.  Throughout the pendency of this case, the defendant has attempted to shift the blame onto others for his crimes and for the ultimate demise of Friedman's.  He has cast false aspersions on his co-conspirators and on Friedman's subsequent management.  His post-trial submissions repeatedly mischaracterize the trial testimony.  At no point in time has he taken a single shred of responsibility for any of his own actions.  Contrary to the claims in his sentencing memorandum, the trial evidence overwhelmingly established that the defendant was the mastermind and chief architect of the securities fraud scheme underlying the counts of conviction.  He directed and controlled the actions of his co-conspirators, and he profited most from the crimes of the conspiracy.  While the government does not contest the defendant's claim that his personal life outside of his leadership of Friedman's and Crescent was commendable, his

failure to accept responsibility for the crimes he committed continually over a sustained period of years, causing devastating financial consequences to Friedman's employees and shareholders, is the overriding characteristic of the defendant that weighs in favor of a lengthy period of incarceration.  See 18 U.S.C. § 3553(a)(1).

CONCLUSION

For the reasons set forth herein, the Court should adopt all of the factual findings contained in the offense conduct section of the PSR and should conclude that the Probation Department correctly calculated the defendant's effective advisory Guidelines range at 70 years. The Court should also conclude that the section 3553(a) factors warrant the imposition of a sentence with a lengthy period of incarceration.

Dated:      Brooklyn, New York
             December 5, 2008

Respectfully submitted,

BENTON J. CAMPBELL
United States Attorney

By:    _____
Scott Klugman
Ilene Jaroslaw
James McGovern
Assistant U.S. Attorneys

cc:    Clerk of Court (NG) (by ECF)
       David W. Shapiro, Esq. (counsel for the defendant Bradley Stinn)
       Senior United States Probation Officer Cheryl M. Fiorillo